IN THE COURT OF APPEALS
OF THE UNITED STATES
FOR THE SIXTH CIRCUIT

LINDA MENGELKAMP,
Plaintiff-Appellee,

vs.

LAKE METROPOLITAN HOUSING AUTHORITY, *et al.*,
Defendants-Appellants.

CASE NO. 12-4468

APPEAL FROM THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

---

# BRIEF OF APPELLANTS, LAKE METROPOLITAN HOUSING AUTHORITY AND STEVEN K. KNOTTS

---

**WILLIAM P. LANG (0008774)**
1300 West 9th Street, #1301
Cleveland, Ohio 44113
(216) 469-9684
Fax: (866) 679-1783
william.lang@williamlangattorney.com

**SUZANNE F. JUCAITIS (0085611)**
P. O. Box 771661
Lakewood, OH 44107
(216) 299-3334
Fax: (866) 679-1783
suzanne.jucaitis@williamlangattorney.com

ATTORNEYS FOR APPELLANTS, LAKE METROPOLITAN HOUSING AUTHORITY AND STEVEN K. KNOTTS

# TABLE OF CONTENTS


Table of Contents .................................................................................. ii

Table of Authorities .................................................................................. iii

Disclosure of Corporate Interest.......................................................... 1

Statement of Jurisdiction .................................................................... 2

Statement in Support of Oral Argument.................................... 2

Statement of Issues for Review ............................................................ 3

Statement of the Case .......................................................................... 4

Statement of Facts ................................................................................ 5

Summary of Argument ........................................................................ 18

Law and Argument ................................................................................ 22
- First Assignment of Error................................................................ 22
- Second Assignment of Error............................................................ 35
- Third Assignment of Error.............................................................. 40
- Fourth Assignment of Error............................................................ 48
- Fifth Assignment of Error................................................................ 51
- Sixth Assignment of Error................................................................ 53

Conclusion .............................................................................................. 58

Appellants' Designation of Appendix Contents .................................. 61

Certificate of Service .............................................................................. 63

Certificate of Word Count Compliance ............................................ 63

Addendum .............................................................................................. 64

## TABLE OF AUTHORITIES

6 Civ. R. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . .2

42 U.S.C. §1981a(b)(2) . . . . . . . . . . . . . . . . . . . . . 42

42 U.S.C. §1981a(b)(3) . . . . . . . . . . . . . . . . . . . . . 21, 44, 48, 52, 54, 56, 58

42 U.S.C. §2000e . . . . . . . . . . . . . . . . . . . . . . . . 2, 25, 44, 56

*Abbott v. Crown Motor Co., Inc.,* 348 F.2d 537 (6th Cir. 2003) . 24, 27, 35-36, 39, 46

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . 23-24

*Barrett v. Detroit Heading, LLC,* 07-1792 (6th Cir. 2009) . . . . 40, Addendum 1

*Betts v. Costco Wholesale Corp*., 558 F.3d 461 (6th Cir. 2009) . 40

*Booker v. Brown and Williamson Tobacco Co., Inc.*, 870 F.2d 1304 (6th Cir. 1989) . . . . . . . . . . . . . . 26, 32-33

*Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 37-39

*Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 53

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . 23

*CGH Transp. Inc. v. Quebecor World, Inc.,* 261 Fed. Appx. 817 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . .54

*Cline v. City of Mansfield*, 745 F.Supp.2d 773 (N.D. Ohio 2010) . . . . . . . . . . . . . . . . . . . . . . . . 54

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . 27

*Daughenbaugh v. City of Tiffin*, 150 F.3d 594 (6th Cir. 1998) . . 24

*Davis v. McCourt*, 226 F.3d 506 (6th Cir. 2000) . . . . . . . . . . 22

*Estate of Mills v. Trizec Properties,* 965 F.2d 113
(6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Farias v. Instructional Sys. Inc.,* 259 F.3d 91 (2nd Cir. 2001) . . 50

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . 27-28

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

Fed. R. Civ. P. 59(a) . . . . . . . . . . . . . . . . . . . . . . . . 51

Fed. R. Civ. P. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804
(6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 54

*Hall v. Consolidated Freightways Corp. of Delaware,*
337 F.3d 669 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . 44, 46-47

*Hall v. State Farm Ins. Co.,* 18 F. Supp. 2d 751
(E.D.Mich. 1998) . . . . . . . . . . . . . . . . . . . . . . . 57

*Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992) . . . . . . . . . . 48

*HLS Bonding v. Ohio Civ. Rights Comm.*, No. 07AP-1071,
2008 WL 3522994 (10th Dist. Aug. 14, 2008) . . . . . . . 25

*Holden v. Owens-Illinois, Inc.*, 793 F.2d 745 (6th Cir. 1986) . . 25-26

*Huff v. Metropolitan Life Ins. Co.,* 675 F.2d 119 (6th Cir. 1982) .53-54

*Jackson v. City of Cookeville,* 31 F.3d 1354 (6th Cir. 1994) . . . 42, 53

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) . . . . . . . . 49,

*Logan v. Dayton Hudson Corp.,* 865 F.2d 789 (6th Cir. 1989) . . .51

*Martini v. Federal National Mortgage Assoc.,*
178 F.3d 1336 (D.C. Cir. 1999) . . . . . . . . . . . . . . . .44-45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .23

McCormick, *Handbook on the Law of Damages* (1935) . . . . 49

*Montgomery Ward & Co. v. Duncan,* 311 U.S. 243 (1940) . . . 52

*Moore v. City of Philadelphia,* 461 F.3d 331 (3d Cir. 2006) . . 30-31

*Morris v. Boston Edison Co.,* 942 F. Supp. 65,
(D. Mass., 1996). . . . . . . . . . . . . . . . . . . . . . . . 25, 38

*Muir v. Chrysler LLC,* 556 F.Supp.2d 783 (N.D.
Ohio 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

O.R.C. §4112 . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Qualicare-Walsh, Inc. v. Ward*, 947 F.2d 823 (6th Cir. 1991) . . 22

*Rice v. CertainTeed Corp.,* 84 Ohio St.3d 417 (1999) . . . . . .45

*Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993) . . . . 57

*Sawicki v. American Plastic Toys, Inc.,* 180 F.Supp.2d 910
(E.D. Mich. 2001) . . . . . . . . . . . . . . . . . . . . . .29-30, 39

*Smith v. Wade,* 461 U.S. 30 (1983) . . . . . . . . . . . . . . . 48

*Stafford v. Electronic Data Systems Corp.,* 749 F.Supp. 781

(E.D.Mich. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 43, 53

*Terry Barr Sales Agency, Inc., v. All-Lock Co.,* 96 F.3d 174
(6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Tompkin v. Philip Morris USA, Inc*., 362 F.3d 882
(6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Hammon*, 277 F.App'x 560 (6th Cir. 2008) . . 40

*United States v. L'Hoste*, 609 F.2d 796 (5th Cir.), cert. denied,
449 U.S. 833 (1980) . . . . . . . . . . . . . . . . . . . . . 35

*Veal v. Upreach LLC*, 2011 Ohio 5406 (Ohio App., 2011). . . . 25, 38

*Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990) . . . . . . . . . 48,

*Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001) 23

*Wathen v. General Electric Co.,* 115 F.3d 400 (6th Cir. 1997) . . 56

*Wells v. Securitas Security Services, USA, Inc.,*
07-15500 (E.D. Mich. 2009) . . . . . . . . . . . . . . . . 29, Addendum 2

*Whittington v. New Jersey Zinc Co.,* 775 F.2d 698
(6th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Williams v. Paint Valley Local Sch. Dist*., 400 F.3d 360
(6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 35

*Winston v. Hardee's Food Systems, Inc.,* 903 F.Supp.1151
(W.D. Ky. 1995) . . . . . . . . . . . . . . . . . . . . . . . 56

*Zakre v. Norddeutsche Landesbank Girozentrale*, 541
F. Supp.2d 555 (S.D.N.Y. 2008) . . . . . . . . . . . . . 49

*Zoppo v. Homestead Ins. Co.,* 664 N.E.2d 397 (Ohio 1994) . . 45, 47

IN THE COURT OF APPEALS
OF THE UNITED STATES
FOR THE SIXTH CIRCUIT

LINDA MENGELKAMP,
Plaintiff-Appellee,

vs.

LAKE METROPOLITAN
HOUSING AUTHORITY, *et al.*,
Defendants-Appellants.

CASE NO. 12-4468

APPEAL FROM THE UNITED
STATES DISTRICT COURT,
NORTHERN DISTRICT OF OHIO,
EASTERN DIVISION

**DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST**

Pursuant to 6th Cir. R. 25, Lake Metropolitan Housing Authority and Steven K. Knotts make the following disclosure:

1. Are said parties a subsidiary or affiliate of a publicly-owned corporation? NO

2. Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome? YES

If the answer is YES, list the identity of such corporation and the nature of the financial interest: Public Entities Risk Consortium – a risk pool created under State laws, of which the Lake Metropolitan Housing Authority is a member.

__s/ William P. Lang______________
William P. Lang
Attorney for the Defendant-Appellants

__2/26/2013____________
Date

## STATEMENT OF JURISDICTION

This is an appeal from finals order of the United States District Court, Northern District of Ohio, Eastern Division, pursuant to the authority granted by 28 U.S.C. Section 1291.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Appellants request oral argument pursuant to 6 Civ. R. 34 inasmuch as this appeal of a retaliation claim brought under Title VII of the Civil Rights Act of 1964, as amended, is of great general interest and will clarify the difference in proof required for claims brought under the “participation clause” and “opposition clause” of 42 U.S.C. §2000e-3(a) and clarify the standard and elements of proof required of punitive damage claims under the Act.

## STATEMENT OF ISSUES FOR REVIEW

I. DID THE TRIAL COURT ERR WHEN IT DENIED THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR RETALIATORY DISCHARGE?

II. WAS THE TRIAL COURT'S INSTRUCTION SETTING FORTH THE ELEMENTS OF THE PLAINTIFF'S RETALIATION CLAIM ERRONEOUS REQUIRING REVERSAL?

III. DID THE TRIAL COURT ERR TO THE PREJUDICE OF THE DEFENDANTS WHEN IT FAILED TO SUBMIT INTERROGATORIES TO THE JURY SUBSTANTIALLY SIMILAR TO THOSE PROPOSED BY THE DEFENDANTS ON THE ISSUE OF DAMAGES AND BY SUBMITTING INTERROGATORIES THAT DID NOT DELINEATE BACK PAY, FRONT PAY, AND COMPENSATORY DAMAGES.

IV. WAS THE PUNITIVE DAMAGE AWARD AGAINST THE DEFENDANT, STEVEN KNOTTS, SUSTAINED BY THE EVIDENCE?

V. DID THE TRIAL COURT ERR BY DENYING THE DEFENDANTS' MOTION FOR A NEW TRIAL?

VI. DID THE TRIAL COURT ERR BY DENYING THE DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT?

## STATEMENT OF THE CASE

The Plaintiff and Appellee in this matter, Linda Mengelkamp, filed an original action in the Northern District of Ohio asserting four causes of action: (1) retaliatory discharge, in violation of 42 U.S.C. § 2000e-3(a) and Ohio Rev. Code §4112.02(I); (2) violation of Ms. Mengelkamp's First Amendment right to free speech; (3) breach of contract, in violation of Ohio law; and (4) violation of Ms. Mengelkamp's right to Due Process [Complaint, RE 3].

The Defendants and Appellants in this matter, Lake Metropolitan Housing Authority (LMHA) and Steven Knotts, moved the court for summary judgment on all claims [Defendants' Motion for Summary Judgment, RE 31]. The Plaintiff, in her reply to the Defendants' Motion for Summary Judgment, abandoned all claims but her retaliatory discharge claim [Brief in Opposition to Defendants' Motion for Summary Judgment, RE 33].

The District Court granted the Defendants' Motion for Summary Judgment on all claims but the Plaintiff's retaliatory discharge claim, and a trial was held on that claim alone [Opinion and Order, RE 59]. At trial, a jury verdict was rendered in favor of the Plaintiff. Compensatory damages of $195,000 were awarded in favor of the Plaintiff and against the Lake Metropolitan Housing Authority, and punitive damages of $105,000 were awarded against Steven Knotts [Judgment, RE

78].

The Defendants filed a Motion to Alter or Amend the Judgment [RE 82] and a Motion for a New Trial [RE 83], both of which were denied by the District Court [RE 93].

This timely appeal followed [Notice of Appeal, RE 96].

## STATEMENT OF FACTS

The facts to be considered by the District Court when ruling on the Defendants' Motion for Summary Judgment, were as follows:

The Plaintiff, Linda Mengelkamp, was employed as the Administrative Office Manager at the Lake Metropolitan Housing Authority from September, 2009, until May, 2010 [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, Mengelkamp Deposition, p. 5, ll. 20-23; p. 6, ll. 11-12].

As a new manager, the Plaintiff was subject to a probationary period of one year from the date of her hire [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, Ex. D, § 3.08(A), (C)]. During the probationary period, the Executive Director, Steven Knotts, had the right to suspend or dismiss the Plaintiff; and termination during this period could not be appealed to the Board. *Id.* At the time of her termination, the Plaintiff was employed by LMHA for less than one year.

The Plaintiff's duties as the Administrative Office Manager required her to foster positive attitudes toward agency goals and to serve as the EEO Coordinator [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, Ex. A, LMHA Position Description, Administrative Office Manager, p. 2, numbered ¶ 4].

She was also required to exercise independent judgment and discretion, understand, interpret, and apply laws, rules, or regulations to specific situations, develop and maintain effective working relationships, and resolve complaints [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, Ex. A, LMHA Position Description, Administrative Office Manager Minimum Acceptable Characteristics, "Ability to," p. 3].

On March 8, 2010, she received a glowing performance review from Steven Knotts, the Executive Director of the Agency who, at that point in time, had no knowledge of any deficiencies in the Plaintiff's job performance [Attach. 2-1 to Defendant's Motion for Summary Judgment, RE 31, Performance Evaluation of Linda Mengelkamp; Attach. 3 to Defendant's Motion for Summary Judgment, Deposition of Steven Knotts, p. 9, ll. 22-25; p. 10, ll. 1-2; p. 20, ll. 3-7, 24-25; p. 21, ll. 1-9].

As of March 9, 2010, the Plaintiff had not received any training about her responsibilities as the LMHA EEO officer. [Attach. 1 to Defendant's Motion for

Summary Judgment, RE 31, p. 46, ll. 6-9]. Furthermore, she had no training as to how to handle sexual harassment complaints [*Id.* at p. 30, ll. 6-8].

On March 9, 2010, LMHA employee, Patricia England, approached the Plaintiff to complain about the manner in which the Executive Director of the agency, Steven Knotts, had treated Ms. England at a managers' meeting that same day. [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, p. 42, ll. 20-25, p. 43, ll. 1-22]. The entire LMHA management staff, including the Plaintiff, was in attendance at the meeting. *Id.* According to the Plaintiff, Ms. England claimed that Mr. Knotts was "discriminating against her because she was a female and she felt that he was being overly aggressive and confrontational towards her because of [her femaleness]" and "that he was not treating her fairly and the same as he did the male members of management" [*Id.* at p. 43, ll. 23-25, p. 44, ll. 1-5].

Ms. England, Mr. Knotts, and the Plaintiff, without witnesses, discussed the allegation [*Id.* at p. 42, ll. 1-25]. The Plaintiff wrote notes, dated March 10, 2010, to memorialize the meeting [*Id.* See, also, Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, Ex. H].

The Plaintiff's notes of the meeting indicated that Ms. England believed that Mr. Knotts was "targeting her" for being a "strong, intelligent female" and for "attempting to undermine her authority as a Manager." *Id.* Ms. England believed

that Mr. Knotts had pushed a safety issue that was brought up by Ms. England in the managers' meeting "under the rug." *Id.* According to her notes, Mr. Knotts asked the Plaintiff if she agreed with Ms. England, and the Plaintiff "agreed with Mrs. England that the reaction was one of offense." *Id.* The Plaintiff expressed her opinion that the "members of the management team should be free to bring up issues and concerns" at managers' meetings. *Id.* Her notes further state that the Plaintiff told Mr. Knotts that his "aggressive reactions toward issue [*sic*] are making some of the staff feel uneasy and if this behavior toward her does not stop she will be forced to contact the EEOC." *Id.* According to the Plaintiff's notes, Mr. Knotts apologized, stated he was unaware that he'd given offense, and all parties agreed to meet again in one month to review Ms. England's complaint and "determine if progress is being made." *Id.*

The Plaintiff, in her deposition, testified that that the one-month period was to allow the parties to determine if Mr. Knotts' treatment of Ms. England during the managers meeting "happened to be a fluke" [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, p. 44, ll. 8-15; 21-25, emphasis added]. She needed time to "pay more attention to interactions between [Ms. England and Mr. Knotts]," to find out if what happened on March 9 was a "bad day" or if it was a "pattern." *Id.*

The Plaintiff did not give Mr. Knotts or Ms. England any opportunity to review her notes for accuracy [*Id.* at p. 42, ll. 1-25]; and she did not interview witnesses or collect witness statements regarding the allegation, did not contact available off-site Human Resources consultants, did not request written statements of the alleged victim or the accused, did not follow up on the allegation, and did not create a written report of the allegation [*Id.* at p. 44, ll. 16-19, p. 45, ll. 1-24, p. 47, ll. 22-25, p. 49, ll. 1-6].

On April 20, 2010, an LMHA employee, Erica Peavy alleged that a vendor, an outside contractor and not an employee of LMHA, on the LMHA property, Scott Gleason, had touched her inappropriately [*Id.* at p. 19, ll. 12-14; p. 20, ll. 9-12]. The Plaintiff informed Mr. Knotts of the allegation and suggested the accused individual be immediately removed from the property [*Id.* at p. 21, ll. 14-25, p. 22, ll. 1-2].

Mr. Knotts met with Mr. Gleason and Tom Huth, the finance manager at LMHA who had been present when Mr. Gleason had touched Ms. Peavy, to discuss the complaint made against Mr. Gleason, after which Mr. Knotts personally escorted Mr. Gleason off of the premises and ordered him never to return [Attach. 3 to Defendant's Motion for Summary Judgment, RE 31, p. 61, ll. 1-6]. The accused individual had no further contact with LMHA employees [Attach. 1 to

Defendant's Motion for Summary Judgment, RE 31, p. 23, ll. 24-25, p. 24, ll. 1-14; *See, also*, Attach. 3 to Defendant's Motion for Summary Judgment, p. 88, ll. 10-16].

The incident involving Ms. Peavy was the first time the Plaintiff had ever handled such a sexual harassment complaint [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, p. 30, ll. 3-8]. The Plaintiff sought help from LMHA's outside human resources contractor, Sandy Conley of Clemans-Nelson, for guidance as to how to proceed. *Id.* In accordance with Ms. Conley's direction, the Plaintiff collected statements from employees and made recommendations to the agency [*Id.* at p. 27, l. 23-25; p. 28, l-8; p. 32, l. 13-25; p. 33, l. 1-15]. The agency implemented those recommendations [*Id.* at p. 88, ll. 10-25].

The Plaintiff, however, took issue with Mr. Knotts' decision to discuss Ms. Peavy's complaint with Mr. Gleason and Mr. Huth. The Plaintiff felt that Mr. Knotts had "given the impression of tainting the investigation" and had "given the appearance, whether true or not, of collusion" [Attach. 1 to Defendant's Motion for Summary Judgment, RE 31, p. 23, ll. 6-15]. The Plaintiff did not believe a witness, Mr. Huth, should have been in the room when Mr. Knotts discussed the complaint with Mr. Gleason [*Id.,* at p. 26, ll. 2-4].

In May, 2010, Mr. Knotts was approached by LMHA's HCV Assistant

Manager, Melissa Martin [Attach. 3 to Defendant's Motion for Summary Judgment, RE 31, p. 26, ll. 5-21; *see, also*, Attach. 5 to Defendant's Motion for Summary Judgment, RE 31, Melissa Martin Depo., p. 7, ll. 24-25; p. 8, ll. 1-10]. Ms. Martin informed Mr. Knotts that she had concerns regarding a co-worker, Ms. England. Ms. Martin indicated that she did not feel comfortable disclosing her concerns about Ms. England to the Plaintiff, the human resources representative, because of the Plaintiff's relationship with Ms. England [Attach. 3 to Defendant's Motion for Summary Judgment, RE 31, p. 27, ll. 2-5; p. 28, ll. 2-9; Attach. 5 to Defendant's Motion for Summary Judgment, p. 9, ll. 20-25, p. 10, ll. 1-11]. Mr. Knotts then asked Ms. Martin to prepare a written statement of her concerns [Attach. 3 to Defendant's Motion for Summary Judgment, p. 29, ll. 4-8; Attach. 5 to Defendant's Motion for Summary Judgment, p. 8, ll. 11-17].

In her statement, Ms. Martin discussed LMHA's lack of a "true" Human Resources department as employees did not feel comfortable taking their concerns to the Plaintiff because her loyalty seemed to lie with Ms. England, not Mr. Knotts, in spite of Ms. England's lack of professionalism, "blatant disrespect, and insubordination" [Attach. 2-3 to Defendant's Motion for Summary Judgment, RE 31, Notice of Corrective Action, Statement of Melissa Martin (May 17, 2010)].

Additional staff members volunteered their own statements regarding the

Plaintiff's unprofessional behavior. The employees described the toxicity of the relationship between Ms. England and the Plaintiff, which resulted in a breakdown of communication and trust between the the Plaintiff and the staff [*Id.,* Statements of Kristin Srpan and Holly Hanna-Coe; *See also*, Attach. 3 to Defendant's Motion for Summary Judgment, RE 31, p. 29, ll. 9-22].

The staff members also complained of the Plaintiff's consistent disruption of the LMHA working environment [Attach. 2-3 to Defendant's Motion for Summary Judgment, RE 31, Statements of Holly Hanna-Coe and Gretchen Molnar].

One staff member wrote that the Plaintiff was insubordinate and disrespectful to the Executive Director, Mr. Knotts [*Id.*, Statement of Linda Ilacqua]. This staff member stated she was personally aware that Ms. England was working in conjunction with the Plaintiff to replace Mr. Knotts as the Executive Director. *Id.*

A member of the LMHA management staff noted that the Plaintiff failed to act in the best interest of the agency [*Id.*, Statement of Mike Cody]. In addition, this manager was aware that the Plaintiff had witnessed Ms. England violate the LMHA hiring policy and that she failed to take any action to correct Ms. England's violation. *Id.* The manager also believed that the Plaintiff was covering for other employees who failed to do their jobs properly. *Id.* The manager stated that the

Plaintiff was subversive and unprofessional. *Id.*

On May 17, 2010, the Plaintiff received a Notice of Corrective Action [Attach. 2-3 to Defendant's Motion for Summary Judgment, RE 31]. She was terminated for failing to treat employees with dignity, courtesy, professionalism and respect, insubordination and not following the oral and written directives of her supervisor, failure to satisfactorily perform her assigned duties, and failure to perform job responsibilities and conduct herself with honesty and integrity. *Id.*

The Plaintiff notified the Board of Commissioners of the Lake Metropolitan Housing Authority that she sought to appeal her termination [Complaint, RE 3, ¶ 52]. The initial hearing date of September 8, 2010 was canceled and rescheduled for November 10, 2010 [*Id.,* at ¶ 53]. The Plaintiff thereafter abandoned her efforts to appeal her termination to the board [*Id.,* at ¶ 54].

On September 22, 2010, Ms. Mengelkamp filed a complaint with both the Ohio Civil Rights Commission ("OCRC") and the U.S. Equal Employment Opportunity Commission ("EEOC") claiming that LMHA retaliated against her on account of her participation in a protected activity [Complaint, RE 3, ¶ 11]. On June 9, 2011, the OCRC issued a ruling of no probable cause [Complaint, RE 3, ¶ 12]. On September 7, 2011, the EEOC also issued a ruling of no probable cause [Complaint, RE 3, ¶ 13].

In her complaint, the Plaintiff claimed that the Defendants wrongfully discharged her because of her ***participation*** in sexual harassment and gender discrimination investigations. In her complaint, she sought remedy for alleged retaliation for her participation in the England and Peavy ***investigations***. [Complaint, RE 3, ¶¶ 20-21, 26, emphasis added].

Subsequent to ruling upon the Defendants' Motion for Summary Judgment, at the trial on the Plaintiff's claim for retaliation, Mr. Knotts testified that when he was hired as the Executive Director of LMHA, the agency was "in a state of turmoil" and that the agency's housing choice voucher program had been certified by the Department of Housing and Urban Development to be in "troubled" status [Trial Transcript, Day 1, RE 100, p. 187, ll. 1-36]. Mr. Knotts, who was charged with turning the agency around, during his tenure, terminated or asked for the resignations of 18 of the 25 to 27 employees who worked at the agency. [*Id.,* at p. 188, ll. 8-11; p. 189, ll. 3-16]. Many of these employees did not have the skills to perform the duties for which they were employed. *Id.*

Mr. Knotts testifed as to the procedure the routinely followed when discharging employees [*Id.,* at p. 189, l. 17-29]. This procedure included collecting documentation and providing it to the attorney for the LMHA Board of Commissioners, whose "concurrence" with the appropriate level of discipline was

*required* [*Id.,* at p. 190, ll. 2-7]. Mr. Knotts did this *every* time an employee was discharged [*Id.*, at p. 190, ll. 8-13]. Sometimes, Mr. Knotts contacted LMHA's human resources contractor, Clemans Nelson, and *its* attorney would review the termination documentation prior to taking action [*Id.,* at p. 190, ll. 15-24].

Prior to making the decision to discharge the Plaintiff, Mr. Knotts received numerous complaints about her from other employees [Trial Transcript, Day 1, pp. 201-209]. He learned that a majority of the staff did not trust her and could not approach her with human resources matters for fear of retaliation. *Id.* Mr. Knotts relied upon these complaints when deciding to terminate the Plaintiff. *[Id.,* at p. 209, ll. 15-17].

Also, prior to making the decision to discharge the Plaintiff, Mr. Knotts conferred with LMHA's attorney and with LMHA's human resources contractor, Clemans Nelson, to determine the appropriate course of action, as was routine procedure when terminating agency employees. [*Id.* at p. 209, ll. 20-25; p. 211, ll. 2-4].

Mr. Knotts also established, and the Plaintiff did not refute, that the LMHA Board of Commissioners had the ultimate power to hire and fire agency employees [*Id.* at p. 191, ll. 17-18].

On the issue of damages, at the time she was terminated in May of 2010, the

Plaintiff was earning an annual salary of $46,000 [Trial Transcript, Day 1, RE 100, p. 110, ll. 22-34]. In 2011, the Plaintiff's salary at her new position with the Christopher Group was $54,580.10 [*Id.* at 112, ll. 14-16]. She was covered by health insurance and had employer-offered pension benefits [*Id.,* at p. 112, ll. 21-25, p. 113, ll. 1-29]. According to the Plaintiff's expert witness, as was obvious, the Plaintiff made more money at her then-current job than she had made while employed by LMHA [*Id.* at p. 179, ll. 24-25; p. 180, l. 1-6].

At the close of trial, the district court, when instructing the jury, stated that the Plaintiff claimed that the Defendants terminated her because she "…opposed a practice made unlawful by Title VII" [Trial Transcript, Day 2, RE 101, p. 334, l. 25; p. 335, ll. 1-3]. The court instructed that the plaintiff, to prove her claim, must first demonstrate that she engaged in protected activity by "investigating and making recommendations" related to the England and Peavy incidents [*Id.* at p. 335, ll. 5-11]. In addition, the court never instructed the jury that the Plaintiff was required to prove that the Defendants knew that the Plaintiff engaged in a protected activity [*Id.,* at p. 355, ll. 19-25; p. 336, ll. 1-7].

Prior to trial, the Defendants submitted two proposed jury instructions to the district court, numbered eight and nine, based on the allegations in the Plaintiff's complaint that she was retaliated against for *participating* in investigations of

gender discrimination and sexual harassment [Defendants' Proposed Jury Instructions, RE 49, pp. 12-14]. A supplemental jury instruction was also submitted to the court prior to trial, jury instruction number 16, an opposition clause instruction, after the district court denied the Defendants' Motion for Summary Judgment on the ground that the Plaintiff *opposed* unlawful activity at LMHA. [Defendant's Supplemental Proposed Jury Instruction, RE 68].

At trial, counsel for the Defendants objected to the court's instruction on the ground that the court had blurred the line on what actions constituted participation in an investigation and what actions constituted opposition under Title VII [Trial Transcript, Day 2, RE 101, p. 346, ll. 16-22]. The Defendants argued that their proposed jury instructions numbered eight and sixteen were the correct statements of law. *Id.* The court overruled the Defendants' objection to the given jury instruction [*Id.,* at p. 347, ll. 19-24].

The trial court, also, in its instructions, defined compensatory damages, back pay, and front pay [Trial Transcript Day 2, RE 101, p. 337, ll. 23-25; p. 338, ll. 1-25; p. 339, ll. 11-20]. The trial court submitted six interrogatories to the jury, only two of which, interrogatories numbered three and four, addressed compensatory damages [Interrogatories, RE 75, p. 3, #3-4]. Interrogatory number three asked only whether the Plaintiff was entitled to compensatory damages. *Id.* Interrogatory

number four asked only what amount of compensatory damages were proper. *Id.*

The Defendants submitted Proposed Jury Interrogatories to the court prior to trial [Defendants' Proposed Jury Interrogatories, RE 69]. The Defendants proposed separate interrogatories for the separate categories of damages. Proposed Interrogatory Number 7 addressed back pay, Interrogatories Number 8 and 9 addressed front pay, and Interrogatories Numbered 10 and 11 addressed compensatory damages, all of which were proper the law.

At trial, the Defendants objected to the court's single interrogatory regarding the amount of compensatory damages [Trial Transcript, Day 2, RE 101, p. 348, ll. 1-9]. The Defendants argued that the law requires that the compensatory damages, front pay, and back pay must be separately considered, and the proposed interrogatories were consistent with the court's instructions regarding damages. The trial court, without discussion, overruled the Defendants' objection. *Id.*

## SUMMARY OF ARGUMENT

The district court improperly denied the Defendants' Motion for Summary Judgment as to the Plaintiff's retaliation claim. The Plaintiff alleged, in her complaint, that she was retaliated against for her participation in a gender discrimination and sexual harassment investigation, but she failed to state a *prima facie* claim for retaliation under the law. The district court improperly denied the

Motion for Summary Judgment, holding that the Plaintiff had stated a claim based upon her opposition to unlawful activity, a claim that the Plaintiff never made in her complaint and failed to properly establish under the law. There was no evidence that she demonstrated any personal opposition to any unlawful activity, and there was no evidence that the Defendants were on notice of the Plaintiff's opposition to unlawful activity. Upon the motion for summary judgment, the Plaintiff's claims should have been dismissed for the reason that there were no justiciable issues of material fact and the Defendants were entitled to judgment as a matter of law; and judgment should have been rendered in favor of the Defendants and against the Plaintiff. The district court erred in failing to do so, requiring reversal of the trial court's order and entry of judgment in favor of the Defendants.

At trial, the district court improperly instructed the jury as to the Plaintiff's retaliation claim. The court's instruction was an amalgamation of the opposition and participation clauses when the elements of proof of each clause are unequivocally different under law. The court, although telling the jury that the Plaintiff sought to recover for opposing a practice made unlawful by Title VII, instructed the jury not as to how the Plaintiff could demonstrate that she opposed unlawful conduct, but rather how the plaintiff could prove a claim for retaliation by "investigating and making recommendations" of unlawful conduct, which is not a

proper instruction of proof required for either opposition or participation. The trial court clearly committed error, requiring that the verdict and judgment of the trial be vacated and that the case be remanded for a new trial.

In addition, the trial court erred by failing to submit proper interrogatories to the jury, as requested by the Defendants, on the issue of damages. The interrogatories submitted by the court did not delineate back pay, front pay, and compensatory damages, were inconsistent with the court's instructions, and contrary to law. The interrogatories propounded by the court improperly included back pay and interest upon back pay as elements of compensatory damages, which is not consistent with the law. The interrogatories propounded by the court also improperly included front pay as an element of compensatory damages so as to prevent a reviewing court from determining whether the amount of front pay awarded was reasonable and not unduly speculative. Moreover, the answers to the interrogatories provide no basis for determining whether the damage award complies with the relevant limitation on damages.

Furthermore, the Defendant, Steven Knotts, was not an employer for purposes of imposing Title VII liability, and the evidence at trial did not establish that Mr. Knotts was liable for punitive damages. The court explicitly held that there was no evidence of malice. However, the court, over the Defendants' objection,

submitted the issue of punitive damages to the jury if it found that Mr. Knotts was recklessly indifferent. The court provided no definition of reckless indifference in its instructions. Nevertheless, there was no evidence presented by the Plaintiff that Mr. Knotts acted with reckless indifference to the Plaintiff's federally protected constitutional rights. Moreover, the Defendants demonstrated that Mr. Knotts sought the advice of legal counsel prior to terminating the Plaintiff. Therefore, as a matter of law, Mr. Knotts was not liable for punitive damages.

The trial court's denial of the Defendant's Motion for a New Trial was an abuse of discretion requiring reversal. Again, the jury interrogatory upon damages was inconsistent with the instructions upon damages, improperly included back pay as a component of "compensatory damages," and by lumping front pay into "compensatory damages," provided no means to determine whether the front pay award was a reasonable interpretation of the evidence or was unduly speculative; and front pay damages should not have been permitted by the court because allowing such damages permitted the plaintiff to receive a windfall.

Finally, the trial court's refusal to grant the Defendants' Motion to Alter or Amend the Judgment was an abuse of discretion that must be reversed. First, the award of damages exceeds the $50,000 limitation on compensatory and punitive damages established in 42 U.S.C. §1981(b)(3). Second, the award of punitive

damages was not sustained by the evidence. Third, Steve Knotts was not an employer for purposes of Title VII liability against whom an award of punitive damages can be made.

## LAW AND ARGUMENT

## FIRST ASSIGNMENT OF ERROR

### THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIM FOR RETALIATORY DISCHARGE.

*Standard of Review*

The Court of Appeals reviews a denial of summary judgment *de novo*. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Therefore, the Court "examines the record in the same manner as the district court." *Id.* See, also, *Estate of Mills v. Trizec Properties*, 965 F.2d 113, 115 (6th Cir. 1992), citing, *Qualicare-Walsh, Inc. v. Ward*, 947 F.2d 823, 825 (6th Cir. 1991).

According to Civ. R. 56, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Fed. R. Civ. P. 56(c).

Rule 56(c) mandates that summary judgment be entered against a party who fails "to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.,* at 323; *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The party opposing summary judgment cannot rest on his pleadings or merely reassert his previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, Rule 56(e) requires the non-moving party to present some type of evidentiary material in support of its position. *Celotex, supra,* at 324.

The inquiry is upon the question of whether the evidence presents a sufficient disagreement as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby,*

*Inc., supra; Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir. 1996). Facts that are not material to the determination of the case are not properly before the Court for its consideration. A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998). The substantive law of the case identifies which facts are considered material. *Anderson v. Liberty Lobby, Inc., supra,* at 248.

Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Law and Argument*

To successfully state a claim for retaliation, the Plaintiff was required to establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). The analysis under Ohio law is identical. *Abbott v. Crown Motor Co., Inc.,* 348 F.2d 537, 541 (6th Cir. 2003)

The Plaintiff did not demonstrate that she engaged in a protected activity. An employee's activity is "protected" under the applicable federal and state law if the employee has "opposed any unlawful discriminatory practice" (the "opposition clause") or "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code" (the "participation clause"). *Veal v. Upreach LLC*, 2011 Ohio 5406 (Ohio App., 2011), citing *HLS Bonding v. Ohio Civ. Rights Comm.*, No. 07AP-1071, 2008 WL 3522994 (10th Dist. Aug. 14, 2008). 42 U.S.C. Section 2000e-3 specifically provides that: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

The activities protected by the participation clause and the activities protected by the opposition clause differ. *Morris v. Boston Edison Co.,* 942 F. Supp. 65, 70 (D. Mass., 1996).

The trial court did not recognize this elementary principal.

In *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745 (6th Cir. 1986), where the plaintiff did not allege that she *participated* in a protected activity, even though she

filed a discrimination charge the day before the defendant discharged her, this Court examined the plaintiff's claim under the "opposition clause," recognizing that activities protected by the participation clause and activities protected by the opposition clause differ. *Id.,* at 748.

In the case at bar, the Plaintiff explicitly asserted her claim against the Defendants for retaliatory discharge because of her role in *investigating* the England and Peavy incidents [Compl. ¶¶ 20-21, 26, RE 3; Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment, "Facts in Support of Retaliatory Discharge Claim," pp. 2-5, RE 33]. She sought remedy from the district court because of her *participation* in these investigations. Therefore, the Plaintiff's claim must be examined in the context of the participation clause of Title VII and state law.

The Sixth Circuit does not recognize internal investigations that occur prior to the filing of an EEOC complaint to be a protected activity so as to support a claim for retaliation. *Muir v. Chrysler LLC,* 556 F.Supp.2d 783, 790-791 (N.D. Ohio 2008); see, also, *Booker v. Brown and Williamson Tobacco Co., Inc.*, 870 F.2d 1304, 1313 (6th Cir. 1989).

"Title VII protects [only] an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where the

investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co., Inc.*, *supra,* at 543.Mere participation in the internal, in-house investigation of alleged discrimination, as the Plaintiff did in the case at bar, not done in conjunction with a formal EEOC charge is not a protected activity. *Id.*

All of Plaintiff's actions related to the England and Peavy allegations were part of internal, in-house investigations at LMHA. *No* charges were pending with the EEOC with regard to either charge. The Plaintiff's activities were not "protected" for the purposes of Title VII and state law.

Despite this, the district court denied the Defendant's Motion for Summary Judgment as to the Plaintiff's retaliation claim, not on the ground that she *participated* in the England and Peavy investigations, but on the ground that she *opposed* unlawful employment practices at LMHA.

The district court committed clear error requiring reversal.

Federal Rule of Civil Procedure 8(a)(2) requires that a Plaintiff set forth a "…short and plain statement of [her] claim" in order to "give the defendant fair notice of what the … claim is and the *grounds upon which it rests*." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (emphasis added).

The Plaintiff did not allege that she was terminated because she opposed any unlawful activity. The Plaintiff did not allege any facts tending to demonstrate that

she opposed any unlawful activity. The Plaintiff failed to put the Defendants on notice of her claim for retaliation based upon her opposition to unlawful activity. The Plaintiff failed to assert that opposition to unlawful activity was a ground for her Title VII claim as required by Federal Rule of Civil Procedure 8(a)(2).

Moreover, even had she claimed that the Defendants retaliated against her because of her demonstrated opposition to unlawful activity at LMHA, the Plaintiff failed to produce any evidence to lawfully support her claim.

With regard to the England charge, the Plaintiff alleged in her complaint and testified that she met privately with Ms. England and Mr. Knotts to discuss Ms. England's allegation of discrimination at a manager's meeting on March 9, 2010. The Plaintiff drafted notes of this meeting. Her notes, which she did not share with Mr. Knotts, stated that Ms. England believed that Mr. Knotts was "targeting her for being a strong intelligent female." And, according to the notes, Mr. Knotts asked the Plaintiff, who was fulfilling her role as the agency human resources representative when facilitating the meeting between Ms. England and Mr. Knotts, whether she agreed with Ms. England. The Plaintiff, according to her notes, stated that she agreed with Ms. England, that his "attitude toward issue [sic] are making some of the staff feel uneasy and if this behavior does not stop she will be forced to contact the EEOC." At the conclusion of the meeting, Mr. Knotts apologized and,

according to the Plaintiff, the parties were to sit down in a few weeks to revisit the matter. The Plaintiff decided to observe the interactions between Mr. Knotts and Ms. England and to determine whether what had occurred at the March 9 managers' meeting was a "fluke," a "bad day," or whether there was, in fact, some "pattern" of bad behavior.

In her affidavit attached to the Brief in Opposition to the Motion for Summary Judgment, the Plaintiff stated only "Steven Knotts treated [Ms. England] differently and more aggressively because she was a woman." What is missing from the Plaintiff's affidavit, her notes of the March 9 meeting between Ms. England and Mr. Knotts, and the entire record is any evidence of actual and personal opposition to unlawful activity.

In *Sawicki v. American Plastic Toys, Inc.,* 180 F.Supp.2d 910 (E.D. Mich. 2001), an analogous case, the plaintiff brought suit for retaliation, alleging that her employment was terminated for "protesting the alleged sexual harassment of co-workers and subordinates by another employee." *Id.,* at 912. See, also, *Wells v. Securitas Security Services, USA, Inc.,* 07-15500 (E.D. Mich. 2009) [Addendum 2]. In that case, the plaintiff learned that four female employees had been subjected to harassment by a co-worker. Having access to a typewriter, "the plaintiff typed up the complaint, the subordinates signed the complaint, and the plaintiff delivered

the complaint to the defendant … The plaintiff also mailed a copy of the complaint to … the human resources manager." *Sawicki, supra*, at 913. The company commenced an investigation as a result of the complaint and interviewed the plaintiff, who indicated that she had witnessed one incident of potential harassment but "could offer no further first-hand knowledge of Taylor's misconduct." *Id.* The plaintiff failed to "offer some evidence that she actually opposed the misconduct." *Id.,* at 916. Therefore, the court held that the plaintiff's conduct did not amount to "*opposition*."

According to the court, "… it could not have been clear to management that the plaintiff … personally opposed the misconduct. It was plaintiff's duty as a supervisor who was approached by her subordinates with a complaint to take action, investigate or send the complaint up the line of authority. That conduct, however, does not constitute '*opposition*.'" *Id.,* at 919.

Merely facilitating a complaint or acting as an intermediary between parties does not demonstrate personal opposition to gender discrimination or sexual harassment. *Id.* See, also, *Moore v. City of Philadelphia,* 461 F.3d 331 (3d Cir. 2006). As the court noted in *Moore*, "[i]f litigants claim to be retaliated against for having opposed discrimination, *they must have stood in opposition to it—not just objectively reported its existence or attempted to serve as an intermediary."*

*Moore, supra*, at 350 (emphasis added).

The plaintiff was the sole human resources person and EEO representative at LMHA. Therefore, when she received Ms. England's complaint against Mr. Knotts and facilitated a meeting between the two, she was fulfilling the responsibilities of her position at the agency. When she drafted notes of the meeting with Mr. Knotts and Ms. England and when she gave Mr. Knotts her opinion about what she observed between Mr. Knotts and Ms. England, she was fulfilling the duties of her position at the agency. When she opted to wait a month to observe the interactions between the parties to see if what happened was a "fluke," a "bad day," or a "pattern," she was fulfilling the duties of her position at the agency. The Plaintiff demonstrated only that, at least as to her actions on March 9, 2010, she was doing what was required to fulfill the responsibilities of her position at the agency.

There is no evidence to demonstrate or from which an inference can be drawn that the Plaintiff personally opposed *any* misconduct. At most, in the notes from the March 9th meeting and in her affidavit, the Plaintiff demonstrated that she served as an intermediary between Mr. Knotts and Ms. England and attempted to resolve their dispute, duties which were required to fulfill the responsibilities of her position at the agency. This is legally insufficient to demonstrate personal opposition to unlawful conduct.

Not only did the Plaintiff fail to demonstrate that she personally stood in opposition to unlawful conduct relative to the England charge, but she failed to demonstrate that she had a reasonable, good faith belief that Mr. Knotts had done anything unlawful in the manager's meeting on March 9, 2010, as is required of her to successfully state a claim for retaliation. See, *Booker v. Brown & Williamson Tobacco Co., Inc., supra,* at 1312-1313. As she testified in her deposition, the Plaintiff thought she should determine whether what occurred at the March 9, 2010, manager's meeting was a "fluke." She wanted to observe Mr. Knotts and Ms. England to determine whether, on March 9, 2010, Mr. Knotts had a "bad day" or whether there was a "pattern" of behavior. The Plaintiff did not demonstrate a reasonable, good faith belief that Mr. Knotts had done anything unlawful. Rather, she demonstrated merely that there was a *possibility* of some unlawful activity and that more observation was required.

The Plaintiff also failed to demonstrate that she opposed an unlawful activity with regard to the Peavy sexual harassment complaint. The record, at the summary judgment stage, demonstrates only that the Plaintiff disagreed with the way that Mr. Knotts handled his role in the investigation of sexual harassment. The Plaintiff did not allege any facts or produce any evidence to demonstrate that she stood opposed to sexual harassment at the agency.

Rather, the Plaintiff's sole complaint was that Mr. Knotts met with Scott Gleason, the accused outside contractor, and Tom Huth, a witness to the alleged incident. Immediately after this meeting, Mr. Knotts personally escorted Mr. Gleason off of the premises and banned him from returning to LMHA property. Yet, the Plaintiff believed that, in some way, Mr. Knotts' actions "put the agency at risk." She believed that Mr. Knotts, in meeting with a man accused of sexual harassment in the same room as a witness to that harassment, had "given the impression of tainting the investigation" and had "given the appearance, whether true or not, of collusion," even though he took the immediate action of ejecting the offender from the premises and forbidding his return. There is no proof, and no inference can be drawn that, *Mr. Knotts* did anything that was unlawful.

Again, the Plaintiff failed to demonstrate that she opposed any unlawful activity by Mr. Knotts or LMHA with regard to the Peavy complaint. There is nothing unlawful about a meeting with an alleged harasser and a witness to discuss a charge of sexual harassment to determine an immediate course of action to prevent further and future contact between the non-employee harasser and an employee. And there is nothing in the record that would indicate that the Plaintiff had a reasonable, good faith belief that Mr. Knotts' actions were unlawful, as is required to properly state a claim for retaliation. *Booker,* supra, at 1312-13.

Furthermore, any attempt by the Plaintiff to claim that she had good faith and reasonable belief that Mr. Knotts behaved unlawfully in meeting with an accused harasser and a witness to objectionable behavior would be completely disingenuous in that she engaged in the *exact* same behavior when dealing with the previously-described England complaint when she, a witness, met with Mr. Knotts, the accused, and Ms. England, the complaining party, to discuss a complaint of gender discrimination.

The Plaintiff failed to demonstrate that she engaged in a protected activity by opposing unlawful activity. She failed to demonstrate that the Defendants were aware that she had opposed unlawful activity by her employer. Therefore, the Plaintiff cannot demonstrate that she was terminated for engaging in a protected activity. Her retaliation claim fails as a matter of law. Summary judgment was improperly denied by the district court.

The Defendants respectfully request that the decision of the district court denying the defendant's motion for summary judgment on the plaintiff's claim for retaliatory discharge be reversed and direct that judgment be entered for the Defendants and against the Plaintiff and that the complaint be dismissed.

## SECOND ASSIGNMENT OF ERROR

**THE TRIAL COURT'S INSTRUCTION SETTING FORTH THE**

**ELEMENTS OF THE PLAINTIFF'S RETALIATION CLAIM WAS ERROR REQUIRING REVERSAL.**

*Standard of Review*

The propriety of jury instructions is a question of law to be reviewed *de novo*. *Williams v. Paint Valley Local Sch. Dist*., 400 F.3d 360, 365 (6th Cir. 2005) "[A] trial court is given broad discretion in wording its jury instructions and will not be reversed as long as the charge correctly states the substance of the law." *United States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir.), *cert.* denied, 449 U.S. 833 (1980).

*Law and Argument*

The Plaintiff alleged that the Defendants retaliated against her because of her participation in investigations of sexual harassment and sex discrimination. Therefore, the Defendants submitted Proposed Jury Instruction Number 8, setting forth the elements that the Plaintiff was required to prove to prevail on her claim.

Proposed Jury Instruction Number 8 provides that the Plaintiff must prove, as the first element of her claim, that the Plaintiff participated in a protected investigation in her employment, specifically that she participated in an investigation conducted pursuant to an ongoing EEOC claim. This is an accurate statement of law in the Sixth Circuit. *See, Abbot v. Crown Motor Co., Inc., supra,*

at 543. The proposed instruction also provided that, as the second element of her claim, the Plaintiff must demonstrate that the Defendants were aware that she participated in a protected investigation.

Despite the fact that the Plaintiff failed to allege that she opposed unlawful activity by her employer, LMHA, and despite the fact that the Plaintiff alleged no facts to demonstrate that she opposed unlawful activity by her employer, the district court denied the Defendants' Motion for Summary Judgment on the ground that there was a triable issue of fact as to whether the Plaintiff opposed unlawful activity.

After the district court rendered its decision on the Defendants' Motion for Summary Judgment, the Defendants submitted Proposed Jury Instruction Number 16 setting forth an accurate statement of the law as to proper proof upon a claim for retaliation based upon opposition to unlawful activity. Proposed Instruction Number 16 instructed the jury, first, that the Plaintiff was required to prove that she opposed unlawful conduct and, second, that the Plaintiff prove that the Defendants knew that she opposed unlawful conduct.

The district court, however, instructed the jury that the Plaintiff, as the first element of her claim, was required to demonstrate that she "…engaged in conduct protected by Title VII…by investigating and making recommendations regarding

[the Peavy and England claims]" [Trial Transcript, Day 2, RE 101, pp. 5-6]. At no time did the court instruct the jury that, in order to prove that the Plaintiff engaged in protected activity by opposing unlawful conduct, she *actually prove* that she *opposed* unlawful conduct. "Investigating and making recommendations" is not opposition. Furthermore, the district court's instruction completely neglected to include the second element of the Plaintiff's *prima facie* claim for retaliation, that the Plaintiff prove that the Defendant was aware that she engaged in protected activity by opposing unlawful conduct. *Canitia v. Yellow Freight Sys., Inc.*, *supra,* at 1066.

The Defendants objected to the court's instruction on the ground that the court's instruction blurred the line between the opposition and participation clauses for the purposes of proof that the Plaintiff engaged in protected activity and argued that the Defendants' Proposed Jury Instructions Number 8 and Number 16 set forth the complete and accurate statements of the law [Trial Transcript, Day 2, RE 101, p. 346, ll. 16-22; p. 347, ll. 2-5]. The court overruled the Defendants' objection on the ground that the court did not believe that the Defendants were using the "appropriate standard" [Trial Transcript, Day 2, RE 101, p. 347, ll. 21-24].

The jury instruction given by the court as to the Plaintiff's retaliation claim was an incorrect characterization of the law and incorrectly stated the substance of

the law. The verdict rendered against the Defendants based upon this instruction cannot stand.

There are four elements the Plaintiff was required to prove to establish a *prima facie* claim for retaliation. *Canitia v. Yellow Freight Sys., supra,* at 1066. First and foremost, the Plaintiff was required to prove that she engaged in a protected activity, that is, either she "opposed any lawful discriminatory practice" (the "opposition clause") or she can prove that she "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing" (the "participation clause") *Veal v. Upreach, supra*. The activities protected by the opposition clause and the participation clause differ. *Morris v. Boston Edison Co., supra*, at 70. The elements of proof of "opposition" and of "participation" differ. The trial court failed to instruct the jury in this regard, incorrectly stating the substance of the law, giving the jury no guidance with which to render a lawful verdict.

The district court's instructions to the jury on the Plaintiff's retaliation charge melded the participation clause and the opposition clause. The court instructed the jury that the Plaintiff could prove that she "opposed" unlawful conduct by showing that she "participated" in investigating the Peavy and England complaints. This is a clear and unequivocal misstatement of the law.

To prove that she engaged in a protected activity by participating in an investigation, the Plaintiff was required to prove that she participated in an investigation that occurred pursuant to a pending EEOC charge. *Abbott v. Crown Motor Co., Inc., supra*, at 543. To prove that she engaged in a protected activity by opposing unlawful conduct at LMHA, the Plaintiff was required to prove that she personally stood in opposition to unlawful conduct. *Sawicki, supra; See, also, Moore, supra,* at 350. There is no basis in law for the court's instruction that a plaintiff can prove that she opposed unlawful conduct by participating in an in-house investigation of a discrimination charge that did not occur pursuant to a pending EEO charge.

Not only did the court's instruction to the jury incorrectly characterize the law as to the first element the Plaintiff was required to prove to state a claim for retaliation, but the court's instruction completely eliminated the second element that the Plaintiff was required to prove. That is, the district court never instructed the jury that the Plaintiff was required prove that the Defendants were aware that she had engaged in a protected activity, whether that activity be participation in an investigation pursuant to a pending EEOC charge or opposition to unlawful conduct. *Canitia v. Yellow Freight Sys., Inc., supra,* at 1066.

The trial court's jury instruction upon retaliation, without question, did not

correctly state the substance of the law and was erroneous and misleading to the trier of fact. The Defendants respectfully urge the Court that if the First Assignment of Error is not sustained, then the verdict and the judgment of the trial court be vacated and set aside and that the case be remanded for a new trial.

## THIRD ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN FAILING TO SUBMIT INTERROGATORIES TO THE JURY PROPOSED BY THE DEFENDANTS ON THE ISSUE OF DAMAGES AND BY SUBMITTING INTERROGATORIES THAT FAILED TO DELINEATE BACK PAY, FRONT PAY, AND COMPENSATORY DAMAGES.**

*Standard of Review*

A district court's decision to submit a proposed interrogatory to the jury is reviewed for abuse of discretion. *Barrett v. Detroit Heading, LLC,* 07-1792 (6th Cir. 2009), Attachment 1, citing, *United States v. Hammon*, 277 F.App'x 560, 568 (6th Cir. 2008). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Betts v. Costco Wholesale Corp*., 558 F.3d 461, 467 (6th Cir. 2009), citing, *Tompkin v. Philip Morris USA, Inc*., 362 F.3d 882, 891 (6th Cir. 2004).

*Law and Argument*

The trial court, in its instructions, defined compensatory damages, back pay, and front pay [Trial Transcript Day 2, RE 101, p. 337, ll 23-25; p. 338, ll. 1-25; p. 339, ll. 11-20]. The court specifically instructed the jury to calculate front pay *separately* [*Id.* at p. 339, ll. 11-16]. Nevertheless, the trial court submitted six interrogatories to the jury, only two of which, interrogatories numbered three and four, addressed compensatory damages [Interrogatories, RE 75, p. 3, #3-4]. Interrogatory number three asked only whether the Plaintiff was entitled to compensatory damages. *Id.* Interrogatory number four asked only what amount of compensatory damages was proper. *Id.*

The Defendants had submitted Proposed Jury Interrogatories to the court prior to trial [Defendants' Proposed Jury Interrogatories, RE 69]. The Defendants proposed separate interrogatories for the separate categories of damages. Proposed Interrogatory Number 7 addressed back pay, Interrogatories Number 8 and 9 addressed front pay, and Interrogatories Numbered 10 and 11 addressed compensatory damages.

At trial, the Defendants objected to the court's single interrogatory regarding compensatory damages [Trial Transcript, Day 2, RE 101, p. 348, ll. 1-9]. The Defendants argued the law requires that compensatory damages, front pay, and back pay must be separately considered. Such interrogatories would be consistent

with the court's instructions regarding damages. The trial court overruled the Defendants' objection. *Id.*

The district court, in lumping damages together into one interrogatory to be considered by the jury, misapplied the law to such an extent that the court abused its discretion. Though the court defined the three separate elements of damages for the jury and instructed that the elements be separately considered, the court provided an interrogatory that was inconsistent with these instructions and, in effect, discouraged the jury from applying the proper standard for each category of damages and to properly consider separately each element of damages, as had been instructed, in order to reach a lawful verdict.

By lumping the damages into one interrogatory as "compensatory damages," the trial court improperly included back pay and interest on back pay as elements of "compensatory" damages, when they are not. 42 U.S.C. §1981a(b)(2) clearly and unambiguously states that "[c]ompensatory damages awarded under this section shall *not* include backpay [or] interest on backpay."

Furthermore, with no indication of the value assessed by the jury for front pay or back pay damages, there is no means to determine if the award for front pay was supported by a "reasonable interpretation of the evidence." *Jackson v. City of Cookeville,* 31 F.3d 1354, 1361 (6th Cir. 1994). Front pay awards have been

considered by courts to be unduly speculative in situations where employees, just like the Plaintiff, have careers ahead of them where there is ample time for them to face reductions, terminations, or to become incapacitated. *Stafford v. Electronic Data Systems Corp.,* 749 F.Supp. 781 (E.D.Mich. 1990). Front pay awards must also be reduced by the amount a plaintiff could earn using reasonable mitigation efforts, which efforts were actually taken by the Plaintiff, as she obtained job in which she earned far more than with LMHA. *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338 (9th Cir. 1987).

Without knowing the portion of the amount of "compensatory damages" that consisted of front pay, there can be no basis for determining that the damages awarded by the jury are in fact reasonable and not unduly speculative, as required by law.

Moreover, the answers to the interrogatories provided no basis for determining whether the damage award complies with the statutory limitation on damages. Lake Metropolitan Housing Authority employed between 25 and 27 individuals through Steve Knotts' tenure as executive director. [Trial Transcript, Day 1, RE 100, p. 189, ll. 15-16]. And an affidavit of the current Executive Director of LMHA, Melissa Winfield, which was attached to the Defendants' Motion for a New Trial, verified that more than 14 but fewer than 101 employees

were employed at LMHA in 2011 and 2012 [RE 83]. Therefore, the limitation on damages set forth in 42 U.S.C. 1981a(b)(3)(A) applies and limits the damages to $50,000 for compensatory *and* punitive damages. Because the amount of compensatory damages improperly included back pay, there is no way for a reviewing court to determine whether the statutory limitation upon damages has been exceeded.

It should be noted, of course, that the Plaintiff brought the present action pursuant to both 42 U.S.C. §2000e-3 and O.R.C, §4112.01, *et seq.* The state claim, unlike the federal claim, is not subject to a limitation on damages. The Sixth Circuit has ruled that plaintiffs may collect damages in excess of the federal cap on their state law claims. *Hall v. Consolidated Freightways Corp. of Delaware,* 337 F.3d 669 (6th Cir. 2003).

The decision in *Hall, supra,* was based upon *Martini v. Federal National Mortgage Assoc.,* 178 F.3d 1336 (D.C. Cir. 1999). In *Martini, supra,* the D.C. Circuit found that any Title VII damages exceeding the cap should be reallocated to the plaintiff's District of Columbia claim. However, in *Martini,* the jurors were given a verdict form with "special interrogatory questions" for assessing damages for each type of claim against each defendant under *each* statute (Title VII and the District of Columbia Human Rights Act). The jury awarded $153,500 in back pay,

$1,894,000 in front pay, and $3,000,000 in punitive damages under Title VII, as well as $615,000 in compensatory damages and $1,286,000 in punitive damages under the District of Columbia Human Rights Act. *Id.,* at 1339, 1349. The *Martini* court so held because the single set of jury instructions addressing the federal and the District of Columbia claims and reallocation was appropriate because the defendants were found liable under both the state and federal claim, as confirmed by the interrogatories that were submitted.

The circumstances in the instant action are not analogous to those in *Martini, supra.* First, the jurors were not given separate interrogatories for the federal and state claims. The jury was presented with a single set of interrogatories that specifically addressed only the federal claim and did not address the separate elements of damages. This proposition is supported by the fact that, under Ohio law, the standard for imposing punitive damages against a defendant is a showing of "actual malice." *Zoppo v. Homestead Ins. Co.,* 664 N.E.2d 397, 402 (Ohio 1994).

In the case at bar, the Court explicitly stated that it found no evidence of actual malice, and submitted the question of punitive damages under the federal standard requiring a showing of "reckless indifference" [Trial Transcript, Day 2, p. 322, ll. 13-25]. *Rice v. CertainTeed Corp.,* 84 Ohio St.3d 417 (1999).

It is true that proof of a claim of retaliation under Ohio Revised Code § 4112 mirrors that brought under Title VII, and courts may analyze these claims under Title VII. *Abbott v. Crown Motor Co., Inc., supra,* at 541 (6th Cir. 2003). However, though the showing of proof required to impose liability upon a claim for retaliation is considered identical under state and federal law, the standard of proof for assessing punitive damages is not.

The trial court, when ruling on the Defendants' post-trial motions addressing this matter, erroneously relied on the Sixth Circuit's holding in *Hall v. Consol. Freightways Corp. of Del., supra,* for the proposition that a punitive damages award premised on federal law could stand under state law. The facts in *Hall* are easily distinguishable from the circumstances in this case, and the holding does not apply to the case at bar.

In *Hall, supra,* the trial court instructed the jury that it could award punitive damages if it found that the defendant acted with "malice or reckless indifference" to the rights of the plaintiff, which is the standard under Title VII. *Hall, supra,* at 678. The *Hall* court then defined malice as either "that state of mind in which a person's conduct is characterized by hatred, ill-will, or a spirit of revenge" or "a conscious disregard for the rights and safety of other persons that has a great probability of creating substantial harm." *Id.* The court defined reckless

indifference as "indifference of an egregious character to the plaintiff's rights to be free of such discriminatory or retaliatory conduct. Reckless indifference reflects that entire want of care which would raise the presumption of conscious indifference to consequences." *Id.* The court held that the trial court's definition of reckless indifference was sufficient to mimic the state law definition of "actual malice," that is, "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id*. See, also*, Zoppo, supra,* 644 N.E.2d at 402.

In the case at bar, the definition of reckless indifference ***is not*** sufficient to amount to actual malice under Ohio law because no definition was actually given by the court [Trial Transcript, Day 2, RE 101, p. 340-341]. The court explicitly stated, after a trial on the merits, but before giving instructions to the jury and over the Defendants' objection that there was no evidence upon which a claim for punitive damages existed, that there was no evidence of malice but that there was sufficient evidence of reckless indifference to submit that issue to the jury [Trial Transcript, Day 2, RE 101, p. 321, 18-20; p. 322, ll. 22-25]. The court stated, more than once, "I don't find there to be evidence of malice" [Trial Transcript, Day 2, p. 326, ll. 16]. It is clear that *Hall* has no application to the case at bar.

The standard for damages set forth by the trial court was clearly and

unequivocally related only to the Plaintiff's federal claim. Therefore, the provision of 42 U.S.C. 1981a(b)(3)(A) limiting the compensatory and punitive damages award to $50,000 applies to this case.

Because back pay and interest on back pay were improperly included in the amount of the "compensatory" damages awarded by the jury, it is not possible to determine by what amount the damage award must be reduced to meet the damage cap imposed by 42 U.S.C. 1981a(b)(3)(A).

Therefore, if the Court does not sustain the First or Second Assignments of Error, the Defendants respectfully request that the verdict and judgment of the trial court be vacated and set aside and that the case be remanded for a new trial.

## FOURTH ASSIGNMENT OF ERROR

**THE PUNITIVE DAMAGE AWARD AGAINST THE DEFENDANT, STEVEN KNOTTS, WAS NOT SUSTAINED BY THE EVIDENCE.**

*Standard of Review*

The standard of review for an award of punitive damages is reasonableness. *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990), *citing, Smith v. Wade,* 461 U.S. 30, 54 (1983). Punitive damages may be awarded "when the defendant's conduct is show to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir. 1992), citing, *Smith v. Wade, supra,* at 56.

*Law and Argument*

Though the Defendants contend that Steven Knotts was not an employer for purposes of imposing Title VII liability, as argued in support of the Sixth Assignment of Error, the evidence does not establish that Mr. Knotts is liable for punitive damages. The damage award was not reasonable given the evidence presented in this matter.

The Supreme Court has held that "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-537 (1999).

To be liable for damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages. *Id.,* at 536. "[A] positive element of conscious wrongdoing is *always* required." *Id.,* at 538 (emphasis added), citing, McCormick, *Handbook on the Law of Damages* (1935), at 280. An employer does not have the requisite state of mind if it "discriminated with the distinct belief that its [alleged] discrimination is lawful, even if that belief is erroneous." *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp.2d 555 (S.D.N.Y. 2008), quoting, *Kolstad, supra,* at 538.

At trial, Mr. Knotts testified that he followed a routine procedure when discharging agency employees [Trial Transcript, Day 1, p. 189, l. 17-29]. This

procedure included consulting with an attorney whose *concurrence* with the appropriate level of discipline was *required* [*Id.*, at 190, l. 2-7]. Mr. Knotts followed this procedure when he discharged the Plaintiff. After receiving numerous complaints from agency employees about the Plaintiff's failure to perform her duties as the agency human resources representative, Mr. Knotts conferred both with LMHA's attorney and with LMHA's human resources contractor, Clemans Nelson, to determine the appropriate course of action [*Id.,* at p. 209, ll. 20-25; p. 211, ll. 2-4]. Ultimately, Mr. Knotts opted to terminate the Plaintiff.

The evidence was not refuted by the Plaintiff. The Plaintiff failed to introduce any evidence from which a jury could infer any conscious wrongdoing on the part of Mr. Knotts. So, too, did the Plaintiff fail to introduce evidence that Mr. Knotts believed that he was doing *anything* unlawful, as required by law. *Kolstad, supra.*

Furthermore, denial of punitive damages as a matter of law is appropriate where the Defendant consulted with counsel before engaging in conduct found to violate Title VII. *Farias v. Instructional Sys. Inc.,* 259 F.3d 91, 101-02 (2nd Cir. 2001). Whether the advice was appropriate or not, action taken pursuant to legal advice prevents an award of punitive damages under the standard articulated in *Kolstad*.

Mr. Knotts testified, and the Plaintiff did not refute, that he *always* consulted with counsel before deciding to terminate an employee and that agreement of counsel with a course of discipline was *always* required. Mr. Knotts also testified that he consulted with counsel before deciding to terminate the Plaintiff. Therefore, denial of punitive damages was appropriate as a matter of law.

The evidence was insufficient for a jury to reasonably conclude that Mr. Knotts acted with reckless indifference to the legality of firing the Plaintiff. The punitive damage award was clear error and the verdict and judgment must be vacated and judgment rendered in favor of Mr. Knotts upon that claim.

## FIFTH ASSIGNMENT OF ERROR

## THE TRIAL COURT ERRED BY DENYING THE MOTION FOR A NEW TRIAL FILED BY THE DEFENDANTS.

*Standard of Review*

A court's denial of a motion for a new trial pursuant to Fed. R. Civ. P. 59(a) is reviewed for an abuse of that discretion. *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir. 1989), citing, *Whittington v. New Jersey Zinc Co.,* 775 F.2d 698 (6th Cir.1985).

*Law and Argument*

The Defendants filed a Motion for a New Trial pursuant to Rule 59(a) [Doc. 83]. This motion was denied by the district court [Doc. 93]. Fed.R.Civ.P. 59(a)

provides that, following a jury verdict, the court may grant a new trial "for any reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

In *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940), the Supreme Court held that a "motion for new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party."

The Defendants' Motion for a New Trial was supported by the same arguments made in support of the Third Assignment of Error and are renewed here.

Although the court defined back pay, front pay, and compensatory damages in its instructions, the interrogatories submitted to the jury did not require a separate analysis of these damages, thereby providing no basis for analyzing the amount of an award subject to adjustment so as to comply with the limitation on damages required by 42 U.S.C. §1981a(b)(3). Furthermore, both back pay and interest on back pay were improperly included as components of "compensatory" damages. 42 U.S.C. 1981a(b)(3).

With no indication of the value assigned by the jury for front or back pay damages in this case, there is no means to determine whether the award for front

pay was supported by a "reasonable interpretation of the evidence," as required by law. *Jackson v. City of Cookeville, supra,* at 361.

Awards of front pay, like awards of back pay, must be reduced by the amount that could be earned using reasonable mitigation efforts. *Cassino v. Reichhold Chemicals, Inc., supra*. In addition, front pay awards have been considered to be unduly speculative in situations similar to the Plaintiff's situation. *Stafford v. Electronic Data Systems Corp., supra.*

Without knowing the amounts awarded by the jury for front and back pay damages, there is no basis to determine that the damages awarded by the jury were reasonable and not speculative, as required by law.

For these reasons, the district court abused its discretion in denying the Defendants' Motion for a New Trial. The decision of the trial court should be reversed, and this case must be remanded for a new trial upon the issues of front pay, back pay, and compensatory damages.

## SIXTH ASSIGNMENT OF ERROR

## THE TRIAL COURT ERRED BY DENYING THE MOTION TO ALTER OR AMEND THE JUDGMENT FILED BY THE DEFENDANTS

*Standard of Review*

Granting or denying a Fed. R. 59(e) motion is within the informed discretion of the district court and is reversible only for abuse. *Huff v. Metropolitan Life Ins.*

*Co.,* 675 F.2d 119, 122 (6th Cir. 1982); *Cline v. City of Mansfield*, 745 F.Supp.2d 773, 841 (N.D. Ohio 2010).

*Law and Argument*

The Defendants filed a Motion to Alter or Amend the Judgment, pursuant to Civil Rule 59(e) [RE 82]. The motion was denied by the district court [RE 93]. The Sixth Circuit has held that a motion to alter or amend may be granted to: "(1) to correct a clear error of law; (2) to account for newly discovered evidence or an intervening change in the controlling law; or (3) to otherwise prevent manifest injustice." *CGH Transp. Inc. v. Quebecor World, Inc.,* 261 Fed. Appx. 817, 823 (6th Cir. 2008), citing, *GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804 (6th Cir. 1999).

The arguments in support of the Defendants' Third and Fourth Assignments of Error also support the Defendants' Motion to Alter or Amend the Judgment and are renewed here.

The judgment against the Defendants exceeds the $50,000 limitation upon compensatory and punitive damages mandated by 42 U.S.C. §1981a(b)(3). This argument has been fully briefed by the Defendants in support of their Third Assignment of Error. To summarize, the instructions given by the trial court to the jury were based *only* upon the federal claim brought by the Plaintiff in this action.

This is evidenced by the fact that the standard for liability used by trial court in its instruction upon the issue of punitive damages was the federal standard of "reckless indifference" rather than the state standard of "actual malice."

The trial court took issue, when ruling on the Defendants' Motion to Alter or Amend, with the failure of the Defendants to object to the jury instruction on this issue, thereby failing to preserve it for review. It makes little sense, however, for the Defendants to object to a jury instruction, once the court indicated it would charge the jury on the issue of punitive damages over the objection of the Defendants, that is favorable to the Defendants position at that juncture. Furthermore, the Defendants did not then, nor do they now, object to the federal standard given to the jury in lieu of the state standard. Rather, the Defendants insist that the court apply the limitation on damages that is consistent with the instruction given and subsequent verdict.

Furthermore, not only was the punitive damage award against Steven Knotts not sustained by the evidence, as argued by the Defendants in support of their Fourth Assignment of Error, but the punitive damage award against Steven Knotts was improper inasmuch as he not an employer, under Title VII, against whom an award of punitive damages could be made.

"The legislative history and the case law support the conclusion that

Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII." *Wathen v. General Electric Co.,* 115 F.3d 400, 405-406 (6th Cir. 1997).

The statutory scheme, taken as a whole, indicates that individual-agent liability was not intended by Congress. Rather, agent "official" liability was intended in order to hold employers responsible for these discriminatory acts.

The 1991 amendments reveal no intent by Congress to expand liability to include agents in their official capacities. The most persuasive argument for this conclusion is the continuation of the express exclusion for small employers and the absence of any mention of individual-agent liability limits on the sliding scale for compensatory and punitive damages. 42 U.S.C.A. § 2000e(b), 42 U.S.C.A. § 1981a(b)(3). Absent such congressional intent to include individual liability, a reinterpretation of the Title VII definition of "employer" finding such liability is unjustified. The purpose of the Act is fulfilled by holding employers responsible for the discriminatory acts committed by their employees and agents. *Winston v. Hardee's Food Systems, Inc.,* 903 F.Supp.1151, 1155 (W.D. Ky. 1995).

An individual qualifies as an "employer" for Title VII purposes if he or she (1) serves in a supervisory position, and has (2) "significant control over plaintiff's hiring, firing, or conditions of employment," and (3) "the ultimate authority over

[the plaintiff's] employment and working conditions." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir. 1993). This definition allows for individual liability when the defendant "operates as an alter ego of the employer." *Id.*

Under Title VII, suits against individuals must proceed in their official capacity, and individual capacity suits are inappropriate. *Hall v. State Farm Ins. Co.,* 18 F. Supp. 2d 751, 761 (E.D.Mich. 1998), citing*, Sauers, supra.*

As Executive Director, Steve Knotts retained *some* authority to hire and fire employees. He was not, however, the *ultimate* authority over employee working conditions; employees could appeal disciplinary actions and terminations to the Board of Commissioners [*See, Complaint,* ¶52, RE 3]. And the undisputed evidence at trial was that the Board had the ultimate power to hire and fire employees at the agency [Trial Transcript, Day 1, RE 100, p. 191, ll. 17-18]. In addition, concurrence of agency legal counsel was always required when imposing discipline on agency employees [*Id.,* at p. 191, ll. 17-18] Therefore, Steven Knotts should not be considered an "employer" in a Title VII action and is not personally liable for punitive damages.

Next the Defendants, in their Motion to Alter or Amend the Verdict, argued that there was insufficient evidence to establish "reckless indifference" required for an award of punitive damages. The Defendants have fully briefed this argument in

their Fourth Assignment of error and renew that argument herein.

Finally, the Defendants, in their Motion to Alter or Amend the Verdict, argued that the punitive damages award of $105,000 against Mr. Knotts, even if considered to be in his official capacity, exceeds the maximum damages award permitted by 42 U.S.C. § 1981a(b)(3). This issue, too, has been fully briefed as a part of the Defendants Third Assignment of Error, and Defendants renew that argument herein.

As ordered, the total verdict of combined compensatory and punitive damages was $300,000, an amount that exceeds the damages limitation mandated by 42 U.S.C. §1981a(b)(3). Should the preceding five assignments of error be found to be not well taken, the Defendants ask that this Court reduce the amount of damages awarded and judgment therefor to $50,000 so as to comply with the statutorily imposed limitation on damages or remand this matter to the trial court with instructions to impose the limitation on damages required by 42 U.S.C. §1981a(b)(3).

**Conclusion**

The Plaintiff failed to establish that she engaged in protected activity, and summary judgment should have been granted in favor of the Defendants on the Plaintiff's claim for retaliation. The Defendants respectfully request that the order

of the trial court denying, in part, the Motion for Summary Judgment be reversed and judgment for the Defendants be entered.

Should this honorable Court sustain the order of the trial court denying, in part, the Defendants' Motion for Summary Judgment, the Defendants respectfully request that the verdict and judgment be vacated and the cause be remanded for a new trial for the reasons stated in the second, third, and/or fifth assignments of error.

Should this honorable Court determine that the Defendants' assignments of error cited immediately above are not well taken, the Defendants respectfully request that the punitive damage award be vacated and set aside and, further, that the trial court's order upon the Motion to Alter or Amend the Verdict be reversed and that the cause be remanded to the trial court with instructions to impose the limitation on damages of $50,000 required by 42 U.S.C. §1981a(b)(3).

Respectfully submitted,

s/William P. Lang________________
**WILLIAM P. LANG**
Ohio Reg. No. 0008774
1300 West 9th Street, #1301
Cleveland, Ohio 44113
(216) 469-9684
Fax: (866) 679-1783
william.lang@williamlangattorney.com

s/Suzanne F. Jucaitis________________

**SUZANNE F. JUCAITIS**
Ohio Reg. No. 0085611
P.O. Box 771661
Lakewood, OH 44107
(216) 299-3334
Fax: (866) 679-1783
suzannejucaitis@williamlangattorney.com

ATTORNEYS FOR APPELLANTS

## APPELLANTS' DESIGNATION OF APPENDIX CONTENTS

The Appellants hereby designate the following filings in the District Court's record as items to be included in the joint appendix:

| Description of Entry | Date | Record Entry |
|---|---|---|
| Complaint | 11/30/11 | 3 |
| Answer | 12/30/11 | 10 |
| Motion for Summary Judgment | 5/29/12 | 31 |
| Deposition of Linda Mengelkamp | 5/29/12 | 31-1 |
| Declaration of Melissa Winfield | 5/29/12 | 31-2 |
| Deposition of Steven Knotts | 5/29/12 | 31-3 |
| Deposition of Greg Schmidt | 5/29/12 | 31-4 |
| Deposition of Melissa Martin | 5/29/12 | 31-5 |
| Brief in Opposition to Defendants' Motion for Summary Judgment | 6/18/12 | 33 |
| Reply to Brief in Opposition to Motion for Summary Judgment | 6/26/12 | 35 |
| Molina v. United States Postal Service | 6/26/12 | 35-1 |
| Deposition of Sandy Conley | 6/26/12 | 35-2 |
| Defendants' Proposed Jury Instructions | 9/1/12 | 49 |
| Opinion and Order | 9/5/12 | 59 |

| | | |
|---|---|---|
| Defendants' Supplemental Proposed Jury Instructions | 9/9/12 | 68 |
| Defendants' Proposed Jury Interrogatories | 9/9/12 | 69 |
| Redacted Verdict with Interrogatories | 9/11/12 | 75 |
| Judgment | 9/12/12 | 78 |
| Motion to Alter/Amend Judgment | 10/2/12 | 82 |
| Affidavit of Melissa Winfield | 10/2/12 | 82-1 |
| Motion for a New Trial | 10/2/12 | 83 |
| Affidavit of Melissa Winfield | 10/2/12 | 83-1 |
| Reply to Brief in Opposition to Motion To Alter or Amend Judgment | 10/16/12 | 87 |
| Reply to Brief in Opposition to Motion For a New Trial | 10/16/12 | 88 |
| Opinion and Order | 11/7/12 | 93 |
| Notice of Appeal | 12/4/12 | 96 |
| Trial Transcript, Day 1 | 1/10/13 | 100 |
| Trial Transcript, Day 2 | 1/10/13 | 101 |

## Certificate of Service

The undersigned certifies that the Brief of Appellants was electronically filed on February 26, 2013. Notice of filing will be sent to all parties by the operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/William P. Lang_________________
**WILLIAM P. LANG**
Ohio Reg. No. 0008774
1300 West 9th Street, #1301
Cleveland, Ohio 44113
(216) 469-9684
Fax: (866) 679-1783
william.lang@williamlangattorney.com

ATTORNEY FOR APPELLANTS

## *Certification of Word Count*

The undersigned certifies that the word count of this document, from the Statement of Jurisdiction through Conclusion, is 12,755 according to the Microsoft Word program. The length of the brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).

s/William P. Lang_________________
**WILLIAM P. LANG**

## ADDENDUM

1. *Barrett v. Detroit Heading, LLC,* 07-1792 (6th Cir. 2009)

2. *Wells v. Securitas Security Services, USA, Inc.*, 07-15500 (E.D. Mich. 2009)

1. Barrett v. Detroit Heading, LLC, No. 07-1792 (6th Cir. 2009)

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0134n.06**
**Filed: February 17, 2009**

**No. 07-1792**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| DONALD L. BARRETT,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>DETROIT HEADING, LLC, a Michigan limited liability company,<br><br>Defendant-Appellant,<br><br>and<br><br>CAROLYN HAMPTON, individually,<br><br>Defendant. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |

BEFORE: RYAN, SILER, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant-appellant Detroit Heading, LLC, terminated plaintiff-appellee Donald L. Barrett under its attendance policy because of his absence from work on November 1, 2004. On that date, Barrett, who had a history of hypertension and was being treated for the disorder, experienced a "hypertensive urgency." Barrett filed a one-count complaint against Detroit Heading and its vice president for human resources, Carolyn Hampton, in her individual capacity, in the United States District Court for the Eastern District of Michigan. He alleged that Detroit Heading and Hampton

violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, by unlawfully discharging him for a serious health condition that rendered him unable to perform his job.

A jury returned a verdict in favor of Barrett and against Detroit Heading but found that Hampton was not liable. Thereafter, Detroit Heading filed a motion for judgment as a matter of law, which the court denied. The court entered judgment in Barrett's favor in the amount of $95,970.18, which included $45,000.00 in damages pursuant to the verdict, $46,257.00 in attorney fees, and $4,713.18 in court costs.

Detroit Heading appeals the judgment, the district court's denial of its motion for judgment as a matter of law, and the court's exclusion of its proposed verdict interrogatory that would have required the jury to find whether Barrett provided "complete and truthful information about his condition that enabled [Detroit Heading] to conclude that his November 1, 2004, absence was protected by the FMLA." As grounds for its appeal, Detroit Heading concedes that, although Barrett provided enough information about his medical condition to trigger a duty on its part to make further inquiry about whether his absence on November 1, 2004, qualified for protection under the FMLA, Barrett failed "to cooperate and share full and complete truthful information about his condition" once Detroit Heading allegedly satisfied its duty.

Because the evidence provided a sufficient basis from which a reasonable jury could have found that Barrett provided Detroit Heading with the required notice under the FMLA and that Detroit Heading violated the FMLA when it terminated Barrett, we affirm the district court on those

issues. Further, because the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form, we also affirm that decision.

I.

Detroit Heading, LLC, is a manufacturing business that produces bolts, screws, nuts, and fasteners for automobiles. In August 2001, Detroit Heading hired Donald L. Barrett as a "header." A header operates large industrial machines that "stamp out" bolts. The job is physically demanding and requires "a lot of bending, a lot of lifting, [and] a lot of pulling." It was not uncommon for Barrett to "break a sweat . . . for an hour or two at a time" while performing his job.

During the relevant period, Carolyn Hampton was Detroit Heading's vice president of human resources, and Ken Weddington was its plant manager. At trial, Hampton and Weddington described Barrett as an "exceptional employee." He "had a skill that very few people in [the] plant had." Barrett's work product was of "very good quality," and he was "hard-working" and "very respectful" to co-workers and supervisors.

Before Barrett began his employment at Detroit Heading, his physician, Dr. Vincent Maribao, diagnosed him with hypertension, an "abnormal elevation of blood pressure" that causes strokes, heart attacks, organ failure, and death. Barrett's hypertension was of the "labile" variety, meaning that "his [blood] pressure can go up and down at a moment's notice." Dr. Maribao treated Barrett's hypertension with medications and by instructing Barrett to rest when under stress. Barrett took his blood pressure medication as prescribed.

Barrett's wife, Rose, is a certified nursing assistant employed by a local hospital. Her job requires that she take patients' blood pressures approximately fifty times per day, and during the relevant period, she regularly took her husband's blood pressure twice a day.

Before Detroit Heading hired Barrett, it required him, as part of its policy, to undergo a pre-employment physical examination "for the purpose of assisting the employment department in placing [him] in a job that is safe to [himself] and others . . . ." On the questionnaire, Barrett disclosed that he had been treated for "abnormal blood pressure." Although the examining physician recommended that Barrett be employed "without restrictions," the doctor noted that Barrett had a history of hypertension and documented his blood pressure at the time of the examination as 142/98.[1] Detroit Heading placed the examination form in Barrett's personnel file.

On eight different occasions between August 2001 and November 1, 2004, Dr. Maribao signed doctor slips excusing Barrett from work because of "uncontrolled hypertension" or "hypertensive urgency." Five of the notes excused Barrett from work for extended periods of one week, six days, eight days, nine days, and six weeks, and one note limited the number of hours Barrett could work over a four-week period. Three of the notes related to Barrett's hospitalization during the summer of 2003, when he experienced a "hypertensive crisis" resulting from a blood pressure reading of 180/138, accompanied by headache and tingling sensations.

---

[1]A normal blood pressure for an adult of Barrett's age is 120/80.

Hampton or Weddington, or both, dated, initialed, and approved each note and placed them in Barrett's personnel file. Weddington testified at trial that he "knew [Barrett] had high blood pressure" because Barrett told him.

In the summer of 2004, Barrett allegedly visited Hampton's office to inquire about his eligibility for leave under the FMLA. According to his trial testimony, Barrett conveyed to Hampton that he had hypertension and that Detroit Heading's vice president of operations had suggested to him in a previous conversation that he might qualify for leave under the Act. Hampton allegedly responded that "there was a lot involved in getting that together," that "[i]t would take her a little bit of time," and that "she didn't think that [he] would qualify under hypertension for Family Medical Leave Act." Barrett testified that he "dropped it at that" because he "assumed that [Hampton] knew what she was talking about and [he] was ignorant of [the] FMLA . . . ."

Prior to January 2004, Detroit Heading permitted its employees to take unlimited numbers of absences provided that they submitted doctors' notes excusing them from work. Because of the high number of employee absences, however, it implemented a No-Fault Attendance Policy in January 2004. The new policy assessed employees one-half of an occurrence for being tardy by less than one hour and one occurrence for being absent or tardy by more than one hour or leaving work early. Detroit Heading took no disciplinary action until the employee accumulated four occurrences, at which time it gave the employee a verbal warning. Each occurrence thereafter resulted in increasing levels of discipline, including a written warning at five occurrences, a three-day unpaid suspension at six occurrences, and termination at the seventh occurrence. When an employee was

absent because of an emergency, Detroit Heading permitted the worker to use vacation or personal days up to three times per calendar year, provided that vacation and personal days were available and that the worker notified management thirty minutes prior to the start of the employee's shift. The policy excused absences, and therefore did not charge employees occurrences, if such absences resulted from: vacation and personal paid days, holidays, work-related injuries, jury duty, approved bereavement, company-approved seminars or educational classes, or leave granted in accordance with state or federal law. Barrett was aware of the No-Fault Attendance Policy.

Barrett agreed that he had his "share of attendance problems" during his employment at Detroit Heading. He missed work on numerous occasions for reasons related and unrelated to his hypertension. Before his shift on November 1, 2004, Barrett had accumulated six occurrences under the No-Fault Attendance Policy.

On November 1, 2004, Barrett awoke "feeling very ill." His symptoms included a headache, tension in his neck, tingling in his face, blurred vision, and "he couldn't even talk straight." Barrett directed his wife to take his blood pressure. His blood pressure measured 180/110 and qualified as a "hypertensive urgency."

Rose Barrett urged her husband to lie down and take his medication, and she then called Dr. Maribao's office. She spoke to Dr. Maribao's secretary, Rose Hicks, and requested that Hicks inform Dr. Maribao that her husband's blood pressure was "very elevated." Mrs. Barrett also conveyed to Hicks Mr. Barrett's blood pressure reading. Hicks placed Mrs. Barrett on hold, consulted with Dr. Maribao, and pursuant to Dr. Maribao's instructions, instructed Mrs. Barrett that

her husband should "stay in bed, take the medication, and take the day off." Because no appointments were available with Dr. Maribao that day, Mrs. Barrett scheduled an appointment for her husband with the doctor on the following day, November 2, 2004. She then relayed Dr. Maribao's instructions to Mr. Barrett.

Within two minutes of her conversation with Hicks and approximately 45 minutes prior to the start of her husband's shift, Mrs. Barrett contacted Detroit Heading to inform it that her husband would be absent from work that day. She asked to speak to Weddington. Weddington was a proper person to notify of Mr. Barrett's absence. Because Weddington was not available, Mrs. Barrett left a message on his voice mail. Company policy permitted employees' spouses to report absences and to leave voice mail messages explaining the reasons for those absences. In her voice mail message, Mrs. Barrett informed Weddington that "Mr. Barrett won't be in" and that he was "asking for an emergency vacation day because his blood pressure was elevated." She also invited Weddington to return her call if he had any questions.

Weddington returned Rose Barrett's call. He agreed at trial that Mrs. Barrett informed him that "the reason Mr. Barrett couldn't come in was because of his high blood pressure, that it had elevated." Weddington also acknowledged that Mrs. Barrett communicated her husband's blood pressure reading to him. Weddington conceded at trial that he did not ask Mrs. Barrett any questions during the call because she told him everything he wanted to know. Although Rose Barrett pleaded for an emergency vacation day on behalf of her husband, Weddington informed Mrs. Barrett that her husband had already exhausted his emergency vacation days.

At trial, Hampton admitted the following:

Q. You heard Mr. Weddington's testimony yesterday, correct?

A. Yes.

Q. And during his testimony he testified under oath that when Mrs. Barrett left a voice mail message for him on November 1st, 2004 that she told him that her husband, Don, could not come into work that day. He couldn't come into work because of his blood pressure going up, and that he needed an emergency vacation day. Do you recall that?

A. Yes.

Mrs. Barrett stayed home from work on November 1, 2004, to care for her husband. She monitored Mr. Barrett's blood pressure every fifteen minutes throughout the day as she would have done with a patient under her care whose blood pressure "was elevated that much." Mr. Barrett slept most of the day on November 1, 2004, and took extra blood pressure medication.

By late afternoon on November 1, 2004, Mr. Barrett's blood pressure dropped to 140/100, which was still an elevated reading. Although the symptoms Mr. Barrett experienced earlier in the morning were not as severe, they remained. He continued resting at home because he did not feel well enough to return to work, Dr. Maribao had ordered him to stay home, he still experienced pain and tension in his face and neck, and he did not think it was safe to work. Dr. Maribao testified that he would not have wanted Mr. Barrett to return to work on November 1, 2004, without evaluating him because the elevated blood pressure can "recur back within a matter of hours, minutes." There is "no guarantee [the blood pressure level is] going to stay down . . . ."

At trial, Hampton agreed that she "would not fault Mr. Barrett for not coming in and working his job as a header with heavy machinery on . . . November 1st, 2004 after his blood pressure went down . . . ." She conceded that if his blood pressure was 140/100, "it could be a danger to his safety and potentially the safety of other employees . . . ."

On November 2, 2004, before his scheduled shift, Mr. Barrett appeared for his appointment at Dr. Maribao's office. His blood pressure measured 130/90, which was borderline but "fairly good" for him, and Mr. Barrett conveyed to Dr. Maribao that he "felt a lot better today." Although Barrett informed Dr. Maribao that he was still experiencing some of the symptoms he felt the previous day, he rejected Dr. Maribao's suggestion to "take one more day off." Dr. Maribao wrote a slip excusing Mr. Barrett's absence from work on November 1, 2004, noting the diagnosis of "hypertensive urgency."

Barrett testified that while checking out and scheduling his next appointment, Hicks offered to fax the note excusing his absence on November 1, 2004, to his employer. Barrett accepted and waited to confirm that Hicks had sent the fax. Because Hicks faxed excuse slips for Barrett to Hampton on previous occasions, she had Hampton's fax number on file. Hampton acknowledged that she permitted employees to fax medical excuse slips to her fax number, and Barrett testified that he witnessed Hicks fax the excuse slip.

Hampton testified that she did not receive the medical excuse slip allegedly faxed on November 2, 2004, and Hicks testified that she could not recall whether she faxed the note two years

earlier. Hicks also stated that her particular fax machine did not produce confirmations indicating whether particular faxes were successfully transmitted.

However, Hicks testified that her usual practice was to copy the excuse note onto an eight-and-a-half by eleven sheet of paper, stand and wait for the fax machine to process the document, and then initial and date the document after the fax machine beeped, indicating that the document had been successfully faxed. The note dated November 2, 2004, and excusing Barrett's absence on November 1, 2004, was copied onto an eight-and-a-half by eleven sheet of paper addressed to "ATTENTION CAROLYN – 1-313-267-2063." Also written on the document were the word "FAXED," the initials "RH" circled, and the date "11/02/04." After examining the document at trial, Hicks confirmed that the notations were made in her handwriting and testified that "[i]t means that I faxed this document over on this date." Phone records indicate that a phone call was made from Hicks's fax number to 313-267-2063 on November 2, 2004. Hampton confirmed that 313-267-2063 is the number to her fax machine. She further conceded that she may have lost the fax and that if she had received the fax, she would have inquired further about Barrett's absence on November 1.

After his appointment with Dr. Maribao on November 2, Barrett returned home to prepare for his shift. While at home, he received a phone call from Hampton. Barrett's and Hampton's testimony about the substance of that call differed.

According to Barrett, immediately after he and Hampton identified themselves on the phone, Hampton informed him that "you were absent yesterday on the first. That was your seventh occurrence. And per policy after the attendance policy, you are hereby terminated." Barrett told

Hampton that he understood her position, Hampton and Barrett told each other that they were sorry "it didn't work out," and Barrett concluded by stating, "But if you're sick, you're sick." Barrett testified that Hampton did not ask him why he was absent on November 1, and he conceded that he did not volunteer that information because he believed that Hampton had received the faxed copy of his doctor's excuse.

According to Hampton, "I asked [Barrett] what was going on with him? You missed yesterday." Hampton emphasized that "I was looking for anything, any reason as to why he didn't come in the previous day" and that any one of the exceptions under the attendance policy would have saved Barrett's job. In their conversation, Barrett offered Hampton no explanation about why he was absent the previous day, and she conveyed to him that he was a good employee whom Detroit Heading did not want to lose. "I went further, and says, Don, you know, you understand you are going to be terminated. He says, do what you have to do. I do not want any special favors." She also stated that "[a]t that time I didn't know what to think. I didn't know, you know, he had another job or whatever."

Although Hampton stated that her reason for calling Barrett on November 2 was to inquire why he was absent the previous day and to discover whether extenuating circumstances might excuse the absence, she conceded at trial that she did not specifically ask Barrett why he was absent:

Q. You did not ask him why he was absent on November 1, 2004, did you?

A. I did not ask him specifically.

* * *

Q. Did you ask him[] why he missed yesterday?

A. No, I did not.

* * *

Q. But you never actually made the inquiry of him and asked him why were you absent yesterday?

A. No, sir, I never made the inquiry.

In addition, although Hampton testified that she believed Barrett had an obligation to share more information with her about the reason for his absence during their telephone communication on November 2, 2004, she also agreed that she "had an obligation to ask more." In other words, the parties agree that during their November 2 conversation, Hampton "didn't ask" and Barrett "didn't tell."

Moreover, Hampton testified that, although she knew that Mrs. Barrett had called Detroit Heading the previous day and spoke to Weddington, she admitted that she did not ask Weddington why Barrett was absent from work on November 1, 2004. Nor did Weddington inform Hampton of his November 1, 2004, conversation with Mrs. Barrett. Hampton agreed that had Weddington informed her of the substance of Rose Barrett's telephone communication on November 1, 2004, she "would have picked up the phone . . . and called Mr. Barrett" to inquire whether his absence was for a "qualifying disability." According to Weddington, Detroit Heading did not involve him in its decision to terminate Barrett.

On November 3, 2004, Hampton sent Barrett a letter confirming his termination. The letter memorialized that Detroit Heading's reason for terminating Barrett was his absence on November 1,

2004, which, under the attendance policy, required his discharge. Hampton also acknowledged at trial that because Barrett had accumulated his seventh occurrence on November 1, 2004, his absence on that date was the cause of his termination.

II.

On June 14, 2005, Barrett filed a complaint against Detroit Heading and Carolyn Hampton, in her individual capacity, in the United States District Court for the Eastern District of Michigan. The one-count complaint alleged that Detroit Heading and Hampton violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*., by unlawfully terminating Barrett for a serious health condition that rendered him unable to perform his job.

The district court denied the parties' cross-motions for summary judgment, and the case proceeded to a four-day trial. Barrett called as witnesses Rose Barrett, Rose Hicks, Ken Weddington, Carolyn Hampton, Dr. Maribao (by video deposition), and himself. Defendants called no additional witnesses. At the close of evidence, defendants moved for a directed verdict, which the district court denied.

The court instructed the jury without objection. In addition to the standard instructions about burden of proof, evidence, and credibility determinations, the court informed the jury about the elements of a claim alleging a violation of the FMLA. The parties stipulated that defendants were employers and that Barrett was an eligible employee covered by the FMLA. Pertinent to this appeal, the district court also instructed the jury:

It is also plaintiff's burden to prove that he gave Ms. Hampton sufficient notice from which she could determine that he had a serious health condition that incapacitated him on November 1, 2004.

The law requires that an employee provide complete and truthful information to his employer about his condition. If the plaintiff cannot prove each and every one of these elements, the inquiry is over and the judgment should be entered in favor of the defendants.

* * *

When the approximate timing of the need for leave is foreseeable, the employee should give notice as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for a leave, except in extraordinary circumstances where such notice is not feasible.

The employee should provide notice to the employer either in person or by telephone, telegraph, fax, or other electronic means. Notice may be given by an employee's spokesperson, for example, a spouse, adult family member or other responsible party if the employee is unable to do so personally.

The employee need not expressly assert rights under the Act or even mention the Act, but may only state that leave is needed.

It is the employer's responsibility to designate an absence as FMLA qualifying. The employer's designation must be based only on the information received from the employee or the employee's spokesperson where the employee is incapacitated and unable to do so personally.

There is sufficient information to put an employer on notice when the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.

An employee gives his employer sufficient notice that he is requesting leave for an FMLA qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA has occurred.

> If an employee provides sufficient notice to the employer that an absence may be covered by the Act, the employer will be expected to obtain any additional required information through informal means.

The court provided jurors with written copies of the instructions.

Defendants objected to the district court's exclusion from the verdict form of their proposed interrogatory, which would have required the jury to find whether Barrett gave "complete and truthful information about his condition that enabled [each defendant] to conclude that his November 1, 2004 absence was protected by the FMLA." The court overruled the objection.

The jury returned a verdict in favor of Barrett and against Detroit Heading but found that Hampton was not liable. Thereafter, Detroit Heading filed a motion for judgment as a matter of law, arguing that Barrett failed, as a matter of law, to provide sufficient notice to Detroit Heading that his absence on November 1, 2004, was covered by the FMLA. The motion also asserted that the jury's finding that Hampton did not violate the FMLA could not be reconciled with its finding that Detroit Heading did violate the FMLA. Specifically, the motion stated that "[b]ecause Hampton was acting individually and on behalf of Detroit Heading at the time she spoke with Plaintiff, Detroit Heading as a matter of law also cannot be held liable." The district court issued an opinion denying the motion and entered judgment in Barrett's favor in the amount of $95,970.18, which included $45,000.00 in damages pursuant to the verdict, $46,257.00 in attorney fees, and $4,713.18 in court costs.

Detroit Heading timely appeals.

III.

Detroit Heading first contends that the evidence at trial did not support the jury's finding that Barrett provided sufficient notice to it that his absence on November 1, 2004, was for an FMLA-qualifying reason. Specifically, although Detroit Heading concedes that Barrett provided enough information about his medical condition to trigger a duty on its part to make further inquiry about whether the absence qualified for protection under the FMLA, Detroit Heading argues that Barrett failed "to cooperate and share full and complete truthful information" once it purportedly satisfied its duty through Weddington's return call to Mrs. Barrett on November 1 and Hampton's call to Mr. Barrett on November 2. According to Detroit Heading, it, "like all other employers, is not clairvoyant; it does not know what the Plaintiff's condition is unless and until the Plaintiff honestly and completely shares his medical information with the employer." Detroit Heading complains that neither Mr. Barrett, his wife, nor the excuse slip from Dr. Maribao suggested that Barrett was "disabled" from working on November 1: "Notifying an employer that an employee's blood pressure is 'up' or 'elevated' is hardly evidence that the employee is disabled from working." Detroit Heading also emphasizes that the Barretts withheld the following information from it:

1. That Mr. Barrett's blood pressure was 180/110 on November 1st;
2. That Dr. Maribao's office spoke to Mrs. Barrett on November 1st;
3. That Dr. Maribao, through Rose Barrett, instructed Mr. Barrett to take his medication, stay in bed, and take November 1st off;
4. That Mr. Barrett saw Dr. Maribao on November 2nd;
5. That Dr. Maribao provided Mr. Barrett with a note on November 2nd excusing his absence from work on November 1st for hypertensive urgency;

6. That Ms. Hicks allegedly faxed the note to Carolyn Hampton on November 2nd; and

7. That Mr. Barrett had the original copy of Dr. Maribao's note in his pocket when he spoke to Carolyn Hampton on November 2nd.

Detroit Heading further maintains that it was improper for Barrett to assume that Hampton received the fax from Dr. Maribao's office and that Barrett had "ample opportunity" to explain the reason for his absence when Hampton telephoned him. Thus, according to Detroit Heading, "the central issue in this [a]ppeal" is "once an employer makes contact with an employee through informal means, what obligations does the employee have to cooperate and share information so that the employer can have all information available and necessary to make a proper determination of an employee's eligibility for FMLA leave[?]"

A denial of a motion for judgment as a matter of law is reviewed de novo. *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 757 (6th Cir. 2004) (citation omitted). Under Federal Rule of Civil Procedure 50(a)(1), a motion for judgment as a matter of law may only be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on an issue fully heard during a jury trial. *See also Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003) (quoting FED. R. CIV. P. 50(a)(1)). Further, in assessing the merits of such a motion, "[a]n appeals court is not to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Bowman*, 350 F.3d at 544 (internal quotations and citation omitted). Instead, the evidence must be viewed "in the light most favorable to the opposing party, drawing all reasonable inferences in its favor." *Id.* "[O]nly if a complete absence of proof exists on

a material issue in the action, or if no disputed issue of fact exists on which reasonable minds could differ" should a court grant the motion. *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004) (citation omitted).

Congress enacted the FMLA because it determined that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). As it relates to this case, the FMLA entitles an eligible employee to a total of twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "Any employer who violates [the FMLA is] liable to any eligible employee affected" for damages, equitable relief, reasonable attorney's fees, reasonable expert witness fees, and other costs. 29 U.S.C. § 2617(a).

To prove that an employer interfered, restrained, or denied an employee his rights under the FMLA, the employee must establish that:

1. he was an eligible employee;
2. the defendant was an employer as defined under the FMLA;

3. the employee was entitled to leave under the FMLA;

4. the employee gave the employer notice of his intention to take leave; and

5. the employer denied the employee FMLA benefits to which he was entitled.

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)).

Detroit Heading challenges only the fourth requirement, that is, whether Barrett gave it notice of his intention to take leave under the FMLA. Because Barrett's absence on November 1, 2004, was "unforeseeable" in that it was not "based on . . . planned medical treatment for a serious health condition of the employee or of a family member . . . ." under 29 C.F.R. § 825.302(a), the notice requirements set forth in 29 C.F.R. § 825.303(b) apply and provide, in relevant part:

> Content of notice. An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request. Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job; that the employee is pregnant or has been hospitalized overnight; whether the employee or the employee's family member is under the continuing care of a health care provider; . . . . When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA. Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act. The employer will be expected to obtain any additional required information through informal means. An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying.

29 C.F.R. § 825.303(b). In addition, 29 C.F.R. § 825.301(b), provides, in pertinent part:

> Employee responsibilities. An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable. An employee giving notice of the need for FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine whether the leave qualifies under the Act. If the employee fails to explain the reasons, leave may be denied. In many cases, in explaining the reasons for a request to use leave, especially when the need for the leave was unexpected or unforeseen, an employee will provide sufficient information for the employer to designate the leave as FMLA leave. An employee using accrued paid leave may in some cases not spontaneously explain the reasons or their plans for using their accrued leave. However, if an employee requesting to use paid leave for a FMLA-qualifying reason does not explain the reason for the leave and the employer denies the employee's request, the employee will need to provide sufficient information to establish a FMLA-qualifying reason for the needed leave so that the employer is aware that the leave may not be denied and may designate that the paid leave be appropriately counted against (substituted for) the employee's FMLA leave entitlement. Similarly, an employee using accrued paid vacation leave who seeks an extension of unpaid leave for a FMLA-qualifying reason will need to state the reason.

The employer's responsibilities in designating leave under the FMLA are set forth in 29 C.F.R. § 825.301(a):

> Employer responsibilities. The employer's decision to designate leave as FMLA-qualifying must be based only on information received from the employee or the employee's spokesperson (e.g., if the employee is incapacitated, the employee's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave). In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying. Once the employer has acquired knowledge that the leave is being taken for a FMLA-qualifying reason, the employer must notify the employee as provided in § 825.300(d).

We have stated that "the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the

employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin*, 346 F.3d at 724).

At the outset, we acknowledge that the undisputed facts demonstrate communication errors by *both* parties.[2] Nevertheless, sufficient evidence supports the jury's verdict that Barrett and his "spokesperson" – his wife – provided adequate notice to Detroit Heading that his November 1 absence may have qualified for leave under the FMLA and that Detroit Heading failed to satisfy its obligation to make further inquiry, thus violating the FMLA when it terminated Barrett. Viewed in the light most favorable to Barrett and drawing all reasonable inferences in his favor, the evidence presented at trial established that: (1) Detroit Heading had a duty to inquire whether Barrett's November 1 absence qualified for protection under the FMLA; and (2) Detroit Heading did not satisfy its obligation to make the required inquiry.

A.

---

[2]Mr. Barrett admitted that he had his fair share of attendance problems at Detroit Heading for reasons related and unrelated to his hypertension, that he pushed Detroit Heading's attendance policy to its limit, that he did not verbally inform Hampton when she called him on November 2 that Dr. Maribao instructed him to stay home and rest on November 1 because of hypertensive urgency, that he did not inform Hampton in that same call that he just returned from an appointment with Dr. Maribao concerning the episode of hypertensive urgency that led to his absence, and that he did not verify that Hampton received the fax from Dr. Maribao's office excusing him from work on November 1. Rose Barrett also acknowledged that she did not inform Weddington in their November 1 conversation that Dr. Maribao instructed her husband to stay home and rest.

Detroit Heading concedes that it incurred a duty to inquire whether Barrett's absence on November 1, 2004, was for an FMLA-qualifying reason. Nevertheless, because the evidence on which that duty arose is pertinent to the analysis of whether Detroit Heading satisfied its obligation to make further inquiry, we set forth the relevant evidence below.

First, Barrett had a history of severe hypertension of which Detroit Heading was aware. Barrett disclosed on his pre-employment questionnaire that he had been treated for "abnormal blood pressure." On eight different occasions during a three-year period, Dr. Maribao wrote notes excusing Barrett from work for "uncontrolled hypertension" or "hypertension urgency." The majority of those notes excused Barrett for *multiple* days and weeks, ranging from one week to six weeks. Hampton and Weddington reviewed the notes, and Weddington testified that he knew Barrett had high blood pressure. Construed in the light most favorable to Barrett, Detroit Heading knew not only that Barrett suffered from a specific disorder – hypertension – but also that his hypertension could be severe and disabling.

Second, on November 1, 2004, Rose Barrett left a message for Weddington, a proper employee to notify, that her husband would be absent that day because his blood pressure was elevated. She invited Weddington to return her call, which he did, and she then conveyed to Weddington her husband's *precise* blood pressure reading. Weddington acknowledged at trial that Mrs. Barrett pleaded for an emergency vacation day on her husband's behalf.

Finally, Hampton received Dr. Maribao's faxed note excusing Barrett from work on November 1, 2004, as the result of "hypertensive urgency" but misplaced or ignored it. Not only did

Barrett testify that he witnessed Hicks fax the note, but it allegedly was addressed to "Carolyn" at Hampton's correct fax number, was inscribed with the notation "FAXED," and was initialed by Hicks and dated November 2, 2004, the date on which Hicks allegedly faxed it. Moreover, telephone records confirm that a call or fax was indeed transmitted from Hicks's fax machine number to Hampton's fax machine number on November 2, 2004.

For all these reasons, Detroit Heading was apparently forced to concede that its duty to make further inquiry was triggered.

B.

Detroit Heading contends that it satisfied its obligation to make further inquiry about whether Barrett's November 1 absence was for an FMLA-qualifying reason. It asserts that it fulfilled its duty to inquire when Weddington and Hampton contacted the Barretts by telephone on November 1 and November 2, respectively. It complains that in response to those inquiries, the Barretts failed to provide "complete and truthful information[,]" thus preventing it from determining whether Mr. Barrett's absence was FMLA-qualifying. Under the applicable standards for assessing the merits of a motion for judgment as a matter of law, however, sufficient evidence presented at trial supports the jury's implied determination that Detroit Heading failed to make the required inquiry for several reasons.

First, although Weddington agreed that Rose Barrett informed him on November 1 that her husband could not work that day because his blood pressure was "elevated," communicated the blood pressure reading to him, and pleaded for an emergency vacation day on behalf of her husband,

Weddington also conceded at trial that he did not ask her any questions and that Mrs. Barrett told him everything he wanted to know. In addition, Hampton agreed that the information Mrs. Barrett provided to Weddington during the November 1 phone call was sufficient "to require Detroit Heading to inquire further to determine whether the leave was potentially protected by the Family Medical Leave Act."[3] Further, Hampton testified that had Weddington relayed to her his conversation with Rose Barrett, she "would have picked up the phone . . . and called Mr. Barrett" to inquire further. Yet Weddington and Hampton admitted that they made no such inquiry.

Second, Hampton conceded at trial that if she received the November 2 medical excuse allegedly faxed to her from Dr. Maribao's office, she would have inquired further. As previously noted, however, the jury could have reasonably concluded that Hampton *did* receive the fax but either misplaced it or ignored it.

Third, the jury could have appropriately determined that Hampton's sole purpose in calling Mr. Barrett on November 2, 2004, was simply to notify him that he was terminated, not to inquire about the circumstances surrounding his absence on the preceding day. Indeed, although Hampton characterized her motive for calling as "looking for anything, any reason as to why [Barrett] didn't come in the previous day" so that she could save his job, she admitted that she did not even ask Barrett why he was absent. She even conceded at trial that she "had an obligation to ask more."

[3]We note that defendants did not object to this question which elicited Hampton's opinion, nor did they argue in their appellate briefs that the question posed by Barrett's attorney was improper.

Fourth, Detroit Heading assumes, without citing any authority, that mere telephone calls by Weddington and Hampton satisfied its duty of "inquiry." An "inquiry" is "[a] request for information." *Black's Law Dictionary* 808 (8th ed. 2004). Based on the admissions by Weddington and Hampton that they did not ask questions, we find no merit to Detroit Heading's argument that it "requested information" simply by dialing a phone number and exchanging pleasantries.

Fifth, both Weddington and Hampton testified consistently that they failed to communicate with *each other* about Barrett's absence on November 1. Hampton never asked Weddington about his conversation with Rose Barrett, although she knew that he had spoken to Mrs. Barrett, nor did Weddington transmit the information conveyed to him by Mrs. Barrett to Hampton.

Finally, the jury could have properly reasoned that Detroit Heading did not make the required inquiry because it did not understand its obligations under the FMLA or was simply not interested in complying with the FMLA. As grounds for that possible conclusion, the jury might have inferred that Hampton simply "brushed off" Barrett's request for FMLA when he allegedly sought information about it in the summer of 2004. Based on Barrett's testimony that Hampton told him that "there was a lot involved in getting that together," that "[i]t would take her a little bit of time," and that "she didn't think that [Barrett] would qualify under hypertension for Family Medical Leave Act," the jury could have reasonably concluded that Hampton believed it to be too difficult and time-consuming to complete and process the required paperwork for FMLA leave and that she therefore ignored the law.

In essence, Barrett presented sufficient evidence to support the jury's implied finding that Detroit Heading failed to make the required inquiry. Accordingly, its argument that the Barretts failed to provide "complete and truthful information" once Detroit Heading allegedly satisfied its obligation to inquire is moot. Assuming that Detroit Heading did not perform the required inquiry, the Barretts could not have provided additional "complete and truthful" information because Detroit Heading made no attempt to *elicit* that information.

C.

None of the cases upon which Detroit Heading relies supports its contention that the jury lacked a sufficient evidentiary basis for its verdict. All of the plaintiffs in the decisions cited by Detroit Heading refused to comply with reasonable requests by their employers about their health conditions, rejected their employers' offers to help them complete the necessary FMLA forms, provided no medical documentation of their serious health conditions to their employers, spoke in general terms about their health such that the employer could only speculate about it, or did not have serious health conditions covered by the FMLA. *See Greenwell v. State Farm Mut. Auto Ins. Co.*, 486 F.3d 840 (5th Cir. 2007) (holding that plaintiff did not provide sufficient notice under the FMLA where she provided no medical documentation from a doctor confirming a serious medical condition, refused to complete an FMLA form which her employer provided and invited her to fill out, and conveyed to her employer that the partial cause of her absence was "asthma" without mentioning that her asthma was an "asthmatic flare-up related to [a] chronic condition."); *McCarron v. British Telecom*, No. CIV.A. 00-CV-6123, 2002 WL 1832843 (E.D. Pa. 2002) (holding that plaintiff failed

to provide sufficient notice under the FMLA where he "required leave to remedy a 'family situation,'" refused to respond to his employer's request to provide "details" about his absence, and told his employer to "leave him alone" after the employer twice left voice mails offering to help him process FMLA forms, requested that plaintiff call, and warned plaintiff of the consequences of not providing a reason for leave); *Walton v. Ford Motor Co.*, 424 F.3d 481 (6th Cir. 2005) (holding that plaintiff did not provide sufficient notice of a serious health condition under the FMLA where he informed his employer that he had "twisted his knee," returned to work after receiving an ice pack and ibuprofen at his employer's medical department, made no attempt to contact his employer during his leave, failed to respond to a 5-day quit letter, did not submit any medical paperwork until nearly two weeks after his employer terminated him, and told his employer that he was taking a "sick day"); *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004) (holding that employer satisfied its duty to inquire by requesting that plaintiff provide medical certification confirming that his absence was, in fact, caused by diabetes and plaintiff refused to comply); *Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452 (6th Cir. 2005) (holding that plaintiff's diagnoses of sinusitis, bronchitis, and ear infection were "routine, short-term illnesses not covered by the FMLA," that plaintiff did not sufficiently notify her employer that she required FMLA leave because "[s]he used very general terms when describing her health such as she 'didn't feel good,' was 'sick,' and 'needed a couple of days to get better, a few days,'" and "did not indicate that she could not work due to illness" upon her return to work); *Reich v. Midwest Plastic Eng'g*, No. 1:94-CV-525, 1995 WL 514851 (W.D. Mich. 1995) (holding that plaintiff failed to provide sufficient information to her

employer that her leave resulted from a "serious health condition" because "she did not communicate that she was under the continuing treatment of a health care provider for her condition of chicken pox," "did not communicate that she had received inpatient care at Vencor Hospital as the result of her having chicken pox[,]" failed to "bring in a doctor's slip verifying her condition," and did not update her employer about her medical status and intent to return to work upon the employer's demand); *Leakan v. Highland Cos.*, No. 96-CV-75445-DT, 1997 WL 33812215 (E.D. Mich. 1997) (holding that plaintiff who requested leave "in order to take a vacation to North Carolina" did not qualify for leave under the FMLA); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973 (5th Cir. 1998) (holding that plaintiff failed to sufficiently notify her employer of FMLA-qualifying condition where "the *only* information [she] imparted to Wal-Mart prior to its discharge decision was a note delivered to Wal-Mart by her mother . . . advising that [plaintiff] 'was having a lot of pain in her side,' and would not be able to work that day, but would like to make it up on one of her days off; and her mother's statement . . . that [plaintiff] was 'sick.'"); *Doughtie v. Ashland, Inc.*, No. 03-2073 ML/AN, 2005 WL 1239286 (W.D. Tenn. 2005) (holding that plaintiff's tonsillectomy did not qualify as a serious health condition, and even if it did, plaintiff failed to sufficiently inform his employer that his absence potentially qualified for FMLA leave where he "did not provide [it] with any medical documentation to show the extent or seriousness of his condition or any time frame upon which he was medically cleared to return to work.").

The facts in those decisions are readily distinguishable from those in this case. Unlike the plaintiffs in the decisions cited, Barrett had a history of a specific health condition – hypertension

– that had previously disabled him for weeks; Detroit Heading does not dispute on appeal that Barrett's condition qualified as a "serious health condition" under the FMLA; Detroit Heading had actual and constructive notice of that condition; Barrett's wife specifically articulated to Detroit Heading that her husband's blood pressure was elevated on November 1, 2004, even informing it of his actual blood pressure reading; Barrett's physician faxed a note to Detroit Heading on the day immediately following the absence; the note informed Detroit Heading that Barrett had suffered a "hypertensive urgency" the previous day; phone records and notations on the faxed document confirmed that the document was indeed faxed; Detroit Heading concedes that Barrett and his wife provided sufficient information to trigger a duty on its part to inquire further; and the supervisory employees to whom the Barretts communicated the information about Mr. Barrett's absence admitted that they did not ask questions about the absence, conceded that they did not even communicate with *each other* about Barrett's absence, and agreed that they should have asked more questions. For these reasons, a sufficient evidentiary basis supports the jury's verdict against Detroit Heading.

D.

Although not made explicit in its appellate brief, Detroit Heading argued in its motion for judgment as a matter of law and implies in its brief that the verdict against it is inconsistent with the verdict in favor of Hampton. Specifically, Detroit Heading suggests that because Hampton is an agent and vice president of Detroit Heading, it cannot be liable if the jury did not find Hampton liable as well. The argument is without merit.

The Supreme Court has stated that "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). Moreover, we have emphasized that "it is incumbent upon a trial court, as well as an appellate court, to reconcile the answers if possible under any view of the evidence in the case." *Waggoner v. Mosti*, 792 F.2d 595, 597 (6th Cir. 1986) (internal quotations and citation omitted). "Federal law favors the harmonization of verdicts and answers to interrogatories wherever that is reasonably possible." *Jewell v. Holzer Hosp. Found., Inc.*, 899 F.2d 1507, 1510 (6th Cir. 1990) (citation omitted). "[E]ven if the answers to jury interrogatories and the verdict do conflict, federal law favors upholding the verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based." *Id.* (citing *Panhandle & Santa Fe Ry. Co.*, 353 U.S. 360, 361 (1957)).

In rejecting Detroit Heading's argument that the verdicts were irreconcilable, the district court explained:

> [I]t is possible from the evidence introduced at trial that the jury could have concluded that Hampton never received sufficient notice of Plaintiff's high blood pressure. Rose Barrett left a voicemail for Weddington and Weddington called her back; both of those "conversations" resulted in Weddington being told that Plaintiff's blood pressure was up. Hampton testified that she never discussed with Rose Barrett, Plaintiff or Weddington the reason for Plaintiff's absence on November 1, 2004. Hampton also testified that she never received the fax from Dr. Maribao's office. Accordingly, there was no evidence at trial that expressly demonstrated that Hampton knew that Plaintiff's blood pressure was up, yet there was evidence that agents of Defendant were aware of Plaintiff's condition.

Consistent with the district court's reasoning, the jury could reasonably have determined that the information conveyed by Rose Barrett to Weddington was sufficient in itself to place Detroit Heading on notice that her husband's absence was potentially covered by the FMLA, thus excusing Hampton from being liable. We also note that Weddington, as Barrett's immediate supervisor, likely had greater knowledge about Barrett than Hampton. In fact, Weddington's testimony confirms that observation. Weddington testified that he knew, based on his conversations with Barrett, that Barrett suffered from hypertension. Therefore, the jury could have appropriately imputed Weddington's "superior" knowledge to Detroit Heading. In this way, the purported "inconsistent" verdicts can be reconciled.[4]

IV.

Finally, Detroit Heading contends that the district court abused its discretion in denying its proposed verdict interrogatory which would have required the jury to find whether Barrett gave "complete and truthful information about his condition that enabled it to conclude that his November 1, 2004, absence was protected by the FMLA." Detroit Heading argues that by omitting this proposed interrogatory, the district court improperly permitted the jury to "skip[] an intermediate step in the analysis, and one of Detroit Heading's defenses – whether Plaintiff provided complete and truthful information to Detroit Heading so that it knew his absence on November 1, 2004 was FMLA qualifying."

---

[4]We also note that the jury may simply have been unwilling to find fault with an individual employee rather than with a corporation. Detroit Heading does not argue, and cites no authority, that the jury's verdict should be overturned on that basis.

As a threshold matter, Barrett counters that Detroit Heading waived this issue on appeal because it failed to set forth the issue in the "issues presented for review" section of its appellate brief. We agree. Under Federal Rule of Appellate Procedure 28(a)(5), "[t]he appellant's brief *must* contain, under appropriate headings and in the order indicated: a statement of the issues presented for review[.]" (Emphasis added.) The provisions of Rule 28(a) are therefore unambiguously mandatory. *See United States v. Baylor*, 517 F.3d 899, 903 (6th Cir. 2008) (Rule 28(a) "*requires* the appellant's brief to contain, *inter alia*, 'a statement of the issues presented for review . . . .'"). (Emphasis added.) In *United States v. Ballard*, 280 F. App'x 468 (6th Cir. 2008), we stated that "[i]ssues that are not presented in accordance with [Rule 28(a)] are not preserved." *Id.* at 471 n.1 (citing *Baylor*, 517 F.3d at 903). Therefore, because Detroit Heading failed to identify the district court's exclusion of its proposed verdict interrogatory as an issue in its "statement of the issues presented for review," we deem it waived.

Even if Detroit Heading properly preserved the issue, it is without merit. A district court's decisions regarding jury instructions and verdict interrogatories are reviewed for abuse of discretion. *United States v. Hammon*, 277 F. App'x 560, 568 (6th Cir. 2008). "[A] judgment will only be reversed if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *United States v. Harrod*, 168 F.3d 887, 892 (1999)) (internal quotations and citation omitted).

The district court did not abuse its discretion in excluding the proposed interrogatory from the verdict form for several reasons. First, Detroit Heading's argument is moot because it concedes

that the Barretts shared enough information about Mr. Barrett's health condition to impose upon it the duty to inquire further. Because sufficient evidence establishes that Detroit Heading did not fulfill that duty, the purported obligation to share "complete and truthful" information was never triggered. Accordingly, any alleged error was harmless and not grounds for reversal.

Second, Detroit Heading cites no authority suggesting that the district court was required, or even that it would have been proper, to include its proposed "complete and truthful" interrogatory on the verdict form. The FMLA requires only that the employee provide "sufficient" or "reasonably adequate" notice to the employer. "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin*, 346 F.3d at 724). Based on the regulatory requirements and decisions interpreting them, Detroit Heading therefore improperly requested a *higher* standard of notice than that which the law actually requires.

Third, the district court, at Detroit Heading's request, instructed the jury that "[t]he law requires that an employee *provide complete and truthful information to his employer about his condition*. If the plaintiff cannot prove each and every one of these elements, the inquiry is over and the judgment should be entered in favor of the defendants." (Emphasis added.) Therefore, although the court did not include the proposed "complete and truthful" interrogatory on the *verdict* form, we must presume that the jury considered whether Barrett provided Detroit Heading with "complete and truthful information about his condition" because the district court *required* it to do so in the *instructions* it gave.

Finally, the proper setting in which to argue that the Barretts provided insufficient notice was not on the verdict form; rather, it was during opening and closing arguments. And because the district court read its instructions to the jury *prior* to closing arguments, Detroit Heading could have "exploited" the "complete and truthful" instruction by, for example, publishing and emphasizing the instruction to the jury.

For all of these reasons, the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form.

V.

In conclusion, the evidence provided a sufficient basis from which a reasonable jury could have found that Barrett provided Detroit Heading with the required notice of his intention to take leave under the FMLA and that Detroit Heading violated the FMLA when it terminated him. Moreover, the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form. Accordingly, we affirm the appealed rulings of the district court.

2. Wells v. Securitas Security Services, USA, Inc., 07-15500
(E.D. Mich. 2009)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL WELLS,

Plaintiff,

v.

CASE NO. 07-15500
HON. LAWRENCE P. ZATKOFF

SECURITAS SECURITY SERVICES USA, INC. and THE UNIVERSITY OF MICHIGAN,

Defendants.
_______________________________________/

# OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse, in the City of Port Huron, State of Michigan, on March 26, 2009

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter comes before the Court on Defendants' respective motions for summary judgment [dkt 27 & 28]. The parties have fully briefed the motions. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the reasons set forth below, Defendant Securitas Security Services' motion for summary judgment is GRANTED, and Defendant The University of Michigan's motion for summary judgment is GRANTED.

Also before the Court is Plaintiff's motion for leave to file a sur-reply brief [dkt 39]. In this

motion, Plaintiff contends that Securitas's reply brief to its motion for summary judgment "contains multiple misstatements of fact and law." Defendants respond that the Federal and Local Rules do not contemplate sur-reply briefs, that Plaintiff's proposed sur-reply is redundant of his initial responses, and that Plaintiff's proposed sur-reply brief exceeds the page limitation imposed on reply briefs by E.D. Mich. L.R. 7.1. Because this matter is before the Court on summary-judgment motions filed by Defendants, the Court must construe all facts in favor of Plaintiff as the non-moving party. Therefore, Plaintiff's concerns of factual misstatements are immaterial, and the Court finds no other compelling reason to consider Plaintiff's sur-reply brief. Accordingly, Plaintiff's motion for leave to file sur-reply brief is HEREBY DENIED.

## II. BACKGROUND

Securitas provides private security officers to clients throughout the United States. Securitas's predecessor hired Plaintiff as a security officer in 2000. Generally, prior to assigning its employees to a client, Securitas sends its employees to interview with the client. If the client finds the employee to be satisfactory, the employee is assigned to that client. Pursuant to that process, Plaintiff was assigned to the central power plant of the University of Michigan in the fall of 2002. In December 2002, Plaintiff was promoted to the position of site supervisor for the central power plant.

In January 2006, an employee of the University named Gerald Avery sexually assaulted another employee of the University, Katherine McCarty. McCarty reported the assault in March of that same year. The University of Michigan investigated the incident and ultimately suspended Avery for one month without pay, demoted his position, transferred him to another plant, and

entered into a "Last Chance Settlement Agreement" with Avery whereby the latter was "not to make any effort to contact, talk to or otherwise seek out [McCarty]." At that time, Avery was the chief steward for his union, Local 547, International Union of Operating Engineers–a position that apparently required him to visit the central power plant periodically.

On April 4, 2007, Plaintiff encountered McCarty in an agitated state. McCarty informed Plaintiff of Avery's 2006 assault against her. She further informed Plaintiff that she had seen Avery on the premises of the power plant earlier that morning. McCarty, however, misrepresented the terms of the Last Chance Settlement Agreement to Plaintiff, indicating that Avery was not permitted at the central power plant while McCarty was on the premises. McCarty indicated to Plaintiff that she had seen Avery at the power plant on several other occasions and that his presence upset her.

Plaintiff contacted the University's Department of Public Safety ("DPS") on behalf of McCarty. At that time, he had not independently verified the actual terms of the Last Chance Settlement Agreement. It is not entirely clear what Plaintiff conveyed to DPS during his initial phone call but approximately one week later, DPS Officer Kevin Rice came to the power plant to speak with McCarty about the incident. Plaintiff was present during the meeting between Rice and McCarty but did not contribute to it. DPS had not previously known about the 2006 assault and, after an investigation, Avery was convicted of a charge of aggravated assault.

On April 13, 2007, DPS Detective Mike Mathews issued Avery a "No Contact Order" pursuant to which he was forbidden from entering the central power plant or otherwise being in McCarty's presence for the duration of the DPS investigation. McCarty told Plaintiff about the No Contact Order on April 16, 2007. Plaintiff, in turn, attempted to contact individuals through the chain of command. Finding no one available, Plaintiff ultimately contacted the University's

Associate Director of Utilities, William Verge, so that the power plant's post orders would reflect that Avery was not to be permitted on site. Verge was apparently upset that he had not been informed of this fact by the power plant's manager, Richard Wickboldt, such that Verge "got in [Wickboldt's] face about it" and "read Wickboldt the riot act."

At some point after Plaintiff's discussion with Verge, Securitas's branch manager, Diane Logan, informed Plaintiff that Wickboldt was upset with him because he got him into trouble with Verge. Another security guard at the power plant, Leonard Pagel, observed Wickboldt casting ominous looks at Plaintiff. On approximately April 27, 2007, Wickboldt emailed Logan to inform her of new chain-of-command procedures regarding whom security officers should approach in Wickboldt's absence. Wickboldt also met with Logan and requested that Plaintiff be removed from the power plant. On that same day, Logan informed Plaintiff that he would be removed from the power plant.

Karen Triplett, Securitas's scheduler, offered Plaintiff four other assignments, including a demotion at the power plant. None of the alternatives involved supervisory positions, and three of the alternatives required Plaintiff to take a pay reduction. The sole alternative that would have compensated Plaintiff at the same rate was a temporary position that might not have exceeded 30 days. Plaintiff declined these positions and worked his last day at the power plant on September 20, 2007.

On September 25, 2007, Plaintiff embarked on an out-of-state vacation. While he was out of town, his mother checked his mail and discovered a letter from Belinda Hamilton, Securitas's human resources manager, assigning Plaintiff to a new position effective October 1, 2007. Plaintiff called Triplett and informed her that he would not be able to begin work on October 1. He left a

voice message to the same effect with Hamilton on the morning of October 1. On October 3, Securitas terminated Plaintiff's employment for consecutive unexcused work absences. Plaintiff had not interviewed or interacted with representatives at his prospective new site at any time.

Plaintiff now brings suit alleging that Defendants, as joint employers, retaliated against him in violation of Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff contends that he opposed a violation of the Act and suffered an adverse employment action as a result.

## III. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Although all inferences must be drawn in favor of the nonmoving party, this Court bears no obligation to imagine favorable facts where the nonmoving party has alleged none. The moving party must also set forth facts sufficient to establish its case: "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Securitas argues that Plaintiff is unable to establish a prima facie case of a retaliation claim because he did not engage in an activity protected by Title VII. Even if Plaintiff's involvement amounted to a protected activity, Securitas argues that Plaintiff did not "oppose" any Title VII violation. Securitas further contends that Plaintiff reported the assault to the University, not to Securitas. As such, Securitas maintains that it was not aware of Plaintiff's alleged "opposition" to a Title VII violation. Securitas points to the alternative positions offered to Plaintiff as evidence that he suffered no adverse employment action. Finally, Securitas takes the position that, even if Plaintiff establishes a prima facie case, the University was entitled to request officer reassignment and that alone provides a sufficient non-discriminatory reason for Plaintiff's transference.

Plaintiff responds that he did engage in a protected activity by assisting McCarty and that he only needed to have a good faith belief that he was opposing sexual harassment. Plaintiff argues that Securitas knew of his protected activity but nevertheless subjected him to an adverse employment action by removing him from the power plant and offering unacceptable alternatives. Finally, Plaintiff maintains that Securitas's proffered non-discriminatory reasons for his termination are pretextual.

To survive Defendants' motions for summary judgment, Plaintiff must establish a prima facie case of discrimination. If Plaintiff succeeds in establishing a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason to justify its action and to rebut Plaintiff's prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). After the employer offers such evidence, the burden returns to Plaintiff to prove by a preponderance of the evidence that the legitimate reason set forth by the employer was mere

pretext for discrimination. *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1998).

A prima facie case of retaliation under Title VII requires Plaintiff to establish that: "(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, . . . and (4) there was a causal connection between the protected activity and the adverse employment action." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Establishing a prima facie case is "the first prong of analysis which defeats a motion for dismissal prior to trial." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Plaintiff's burden at the prima-facie stage of proceedings "is minimal, requiring [him] to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Id.* Still, Plaintiff, in this Title VII action, "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).

Under Title VII, an individual engages in a protected activity when he "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The federal courts "have generally granted less protection for opposition than for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). For Plaintiff to engage in a protected opposition activity under Title VII, he "must make an overt stand against suspected illegal discriminatory action." *Comiskey v. Auto. Indus. Action Group*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999). Therefore, "a vague charge of discrimination . . . is insufficient to constitute

opposition to an unlawful employment practice." *Booker*, 879 F.2d at 1313. At the same time, opposition "need not rise to the level of a formal complaint in order to receive statutory protection." *Allen v. Advanced Digital Info. Corp.*, 500 F. Supp. 2d 93, 109 (N.D.N.Y. 2007). There is no exhaustive list of opposition activities, but they include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Here, Plaintiff alleges that he "opposed" sexual harassment in a number of ways, thereby entitling him to the protections of Title VII. Although it is not entirely clear what Plaintiff conveyed to DPS during his phone call, the Court construes the facts of the matter in his favor for the purpose of Defendants' summary-judgment motions. Therefore, the Court accepts as true that Plaintiff was reporting in good-faith what he believed was an incident of sexual harassment. Plaintiff also prepared a brief incident report in which he wrote that Avery "was in the building . . . in violation of an agreement that was made with the Human Resources dept., which states that Gerald Avery isn't supposed to be in the building when Katherine McCarty is." Also in the report, which Plaintiff submitted to both a University contact and his superior within Securitas, Plaintiff wrote that he left a message for DPS "in accordance with the Securitas Security Officer Handbook section on Reporting Unsafe Conditions and Security Risks." Plaintiff did not mention harassment in the incident report. Finally, at the request of McCarty, Plaintiff was present when Officer Rice interviewed her but he did not contribute to the interview. Plaintiff also submits that his phone call informing Verge that Avery was banned from the power plant was an act of opposition. These actions, however, do not constitute opposition to an unlawful employment practice.

In *Sawicki v. American Plastic Toys, Inc.*, 180 F. Supp. 2d 910 (E.D. Mich. 2001), the plaintiff brought suit for retaliation, alleging that her employment was terminated for "protesting the alleged sexual harassment of co-workers and subordinates by another employee." *Id.* at 912. In that case, the plaintiff learned that four female employees had been subjected to harassment by a co-worker. Having access to a typewriter, "the plaintiff typed up the complaint, the subordinates signed the complaint, and the plaintiff delivered the complaint to the defendant . . . . The plaintiff also mailed a copy of the complaint to . . . the human resources manager." *Id.* at 913. The company commenced an investigation as a result of the complaint and interviewed the plaintiff, who indicated that she had witnessed one incident of potential harassment but "could offer no further first-hand knowledge of Taylor's misconduct." *Id.* In *Sawicki*, the plaintiff failed to "offer some evidence that she actually opposed the misconduct." *Id.* at 916. Therefore, the court held that the plaintiff's conduct did not amount to "opposition":

> [I]t could not have been clear to management that the plaintiff intended to file suit on behalf of her subordinates, or that she personally opposed the misconduct. It was plaintiff's duty as a supervisor who was approached by her subordinates with a complaint to take action, investigate or send the complaint up the line of authority. That conduct, however, cannot constitute "opposition" on this record.

*Id.* at 919. In this case, Plaintiff merely called DPS to facilitate McCarty's complaint, an action explicitly required of him in his capacity as security guard. Like the actions of the plaintiff in *Sawicki*, Plaintiff's actions did not indicate personal opposition to perceived sexual harassment. *See Moore v. City of Philadelphia*, 461 F.3d 331, 350 (3d Cir. 2006) ("If litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it–not just objectively reported its existence or attempted to serve as an intermediary."). Therefore, the Court

finds that Plaintiff's actions in this matter do not amount to opposition under Title VII and therefore, his prima facie case of retaliation necessarily fails.

Even if Plaintiff's actions could be considered "opposition," he would not be able to establish the causation element of the prima facie case. Construing the facts of the case in the light most favorable to Plaintiff, the Court finds that Wickboldt wanted Plaintiff removed from the power plant because Plaintiff got Wickboldt into trouble by contacting Verge directly. There is no indication that Wickboldt's displeasure had anything to do with the fact that Plaintiff allegedly reported an instance of potential sexual harassment.

The record reveals that both Defendants treated Plaintiff unfairly. The facts of the case establish that Plaintiff was dutiful and vigilant in carrying out the responsibilities of his position as security guard. In attempting to follow the chain of command regarding what Plaintiff in good faith believed to be a serious security concern, Plaintiff inadvertently got Wickboldt in trouble with a supervisor and immediately thereafter, Wickboldt asked that Plaintiff be reassigned. That the University of Michigan removed Plaintiff from his position for his attentiveness to McCarty's wellbeing is appalling. That Securitas did not present Plaintiff with a suitable replacement opportunity is equally appalling. Finally, that Securitas terminated Plaintiff's employment despite the fact that he informed Securitas of his vacation and despite the fact that Securitas did not follow its typical interviewing process is a gross disservice to an employee who did nothing wrong. Plaintiff very well may have legal recourse on an alternate theory of recovery. Unfortunately for Plaintiff, however, he is unable to establish a prima facie case for retaliation under Title VII. Specifically, Plaintiff's actions with respect to McCarty do not amount to "opposition" of an unlawful employment practice. Because Plaintiff cannot establish a prima facie case against either

Defendant, both motions for summary judgment must be granted.

## V. CONCLUSION

For the above reasons, Plaintiff's motion for leave to file sur-reply brief is HEREBY DENIED.

IT IS FURTHER ORDERED that Defendants' motions for summary judgment [dkt 27 & 28] are both GRANTED.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on March 27, 2009.

S/Marie E. Verlinde
Case Manager
(810) 984-3290