NO. 12-4468

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**LINDA MENGELKAMP,**
*Plaintiff-Appellee,*

v.

**LAKE METROPOLITAN HOUSING AUTHORITY,** *et. al.*
*Defendants-Appellants,*

**On Appeal from the United States District Court**
**for the Northern District of Ohio, Eastern Division**
**Case No. 1:11-CV-2589**
**HON. JAMES S. GWIN**

# BRIEF OF APPELLEE

Robert P. Sweeney (Oh. Bar No. 0026605)
ROBERT E. SWEENEY CO., L.P.A.
55 Public Square, Ste. 1500
Cleveland, Ohio 44113
(216) 696-0606
rps@rescolaw.com

Attorney for Plaintiff-Appellee

## STATEMENT OF CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS

Pursuant to 6th Cir. R. 26.1, Linda Mengelkamp, makes the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

N/A

2. Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

If the answer is YES, list the identity of such corporation and the nature of the financial interest:

N/A

/s/Robert P. Sweeney
Robert P. Sweeney (0026605)

DATE: April 9, 2013

# TABLE OF CONTENTS

Page

STATEMENT OF CORPORATE AFFILIATION AND FINANCIAL INTEREST..... i

TABLE OF AUTHORITIES.......................................................................................... iv, v,vi

STATEMENT CONCERNING ORAL ARGUMENT................................................. 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.......... 1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW....................... 2

STATEMENT OF THE CASE........................................................................... 3

A. Nature of the Case..................................................................... 3

B. Course of Proceedings............................................................... 4

STATEMENT OF FACTS.................................................................................. 7

SUMMARY OF ARGUMENT............................................................................ 18

ARGUMENT...................................................................................................... 20

I. **The district court did not err in instructing the jury that Ms. Mengelkamp was engaged in conduct protected by Title VII by investigating and making recommendations regarding claims of gender discrimination and sexual harassment, even though there was no pending EEOC charges filed at the time.**................................. 20

**A. As a preliminary matter, the district court's ruling denying the defendants' summary judgment motion on this same issue is not reviewable on appeal.**................................. 21

**B. The district court correctly instructed as to the issue of "protected conduct" and how it could be established as a necessary element of plaintiff's retaliation claim.**.......................... 22

II. **The district court did not err to the prejudice of the defendants in deciding not to submit interrogatories to the jury to delineate between back pay, front pay, and compensatory damages**.......................... 33

III. **The punitive damage award against the Defendant, Steven Knotts, was sustained by the evidence.**............................................. 37

IV. **The district court did not err by denying the defendants post-trial motions to alter or amend the judgment, or for new trial.**......................................................................................... 39

CONCLUSION AND RELIEF REQUESTED............................................................ 42

CERTIFICATE OF COMPLIANCE.................................................................... 44

CERTIFICATE OF SERVICE......................................................................... 45

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ...................... 46

# TABLE OF AUTHORITIES


| **CASES** | **Pages** |
|---|---|
| *Abbott v. Crown Motor Co.*, 348 F.3d 537 (6th Cir. 2004) | 27, 35, 41 |
| *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989) | 26, 28 |
| *Conley v. Gibson*, 335 U.S. 41, 47 (1957) | 11, 12, 24 |
| *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 555 U.S. ____ (2009) | 29, 30, 31, 32 |
| *Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007) | 35 |
| *Farias v. Instructional Syst.*, 259 F.3d 91 (2nd Cir. 2001) | 38 |
| *Fisher v. Ford Motor Co.*, 224 F.3d 570 (6th Cir., 2006) | 21, 34 |
| *Hall v. Consol. Freightways Corp. of Delaware.*, 337 F.3d 669, 677 (6th Cir. 2003) | 35, 41, 42 |
| *Harker v. Utica College of Syracuse Univ.*, 885 F. Supp. 378 (N.D.N.Y., 1995) | 26 |
| *Holden v. Owens Illinois, Inc.*, 793 F.2d 745 (6th Cir., 1986) | 31, 32 |
| *Huff v. Metropolitan Life Ins.*, 675 F.2d 119, 122 (6th Cir. 1982) | 40 |
| *Kolstad v. American Dental Assoc.*, 527 U.S. 526 (1999) | 38 |
| *Leichtamer v. Am. Motors Corp.*, 424 N.E.2d 568, 579 (Ohio 1981) | 42 |
| *Martini v. Federal National Mortgage Assoc.*, 178 F.3d 1336 (D.C. Cir. 1999) | 41 |
| *Morris v. Boston Edison Co.*, 942 F. Supp. 65 (Dist. Ct., D. Mass.)(1996) | 27 |

*Muir v. Chrysler LLC*, 563 F.Supp.2d 783 (N.D.Ohio 2008) 28, 29

*Ortiz v. Jordan et. al.*, 131 S.Ct. 884, 562 U.S. ___ (2011) 22, 24

*Rodgers v. Fisher Body Div.*, 739 F.2d 1102, 1107 (6th Cir. 1984) 36

*Sawicki v. American Plastic Toys Inc.*, 180 F. Supp.2d 910 (E.D.Mich., 2001) 26, 27, 28

*Smith v. Wade*, 461 U.S. 30, 54 (1983) 37, 38

*Sumner v. United States Postal Service*, 899 F.2d 203 (2nd Cir., 1990) 26

*Veal v. Upreach LLC*, 2011 Ohio 5406 (Ohio App., 10th Dist., 2011) 27

*Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990) 37

*Ward v. Hengle*, 124 Ohio App.3d 396 (Ohio Ct. App. 1997) 42

*Wells v. Securities Services, U.S.A., Inc.*, 07-15500 (E.D. Mich. 2009)(Unreported. Addendum to Appellants Brief) 27

*Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir., 2005) 21

*Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 402 (Ohio, 1994) 42

**RULES**

FRCP 8(a)(2)........................................................................................................24
FRCP 50(b)..........................................................................................................6, 24
FRCP 59 ..............................................................................................................6, 39, 40

**STATUTES**

42 U.S.C. §1331 .....................................................................................................1
28 U.S.C. §1367 .....................................................................................................1
28 U.S.C. §1291 .....................................................................................................1
42 U.S.C. §1983 (b)(3)(A)......................................................................................34, 40
42 U.S.C. §2000e...................................................................................................1
42 U.S.C. §2000e-5(f)(3)........................................................................................1
42 U.S.C. §2000e-3................................................................................................4, 23, 32
Ohio Revised Code §4112.01.................................................................................1,34,35, 41, 42
Ohio Revised Code §2315.18(B)(2)........................................................................20, 35

**OTHER**

Executive Order 11246 ..........................................................................................32

## STATEMENT CONCERNING ORAL ARGUMENT

Appellee respectfully requests oral argument.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

### A. District Court's Jurisdiction

This case was brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e et. seq., invoking federal question jurisdiction pursuant to Title 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f)(3) on the claim of retaliatory discharge due to her opposition to and investigation of charges of gender discrimination in the workplace. The case also invoked the supplemental and pendent jurisdiction of the Court, pursuant to 28 U.S.C. 1367, for resolution of State claims arising out of the Ohio Civil Rights Act, Ohio Revised Code §4112.01 et. seq.

### B. Jurisdiction of Court of Appeals

This is an appeal from final verdict and judgment, entered by the District Court on September 12, 2012. The appellate jurisdiction is established pursuant to 28 U.S.C. §1291.

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

### I.

In her complaint, Linda Mengelkamp alleged that the defendants Lake Metropolitan Housing Authority (LMHA) and Steven Knotts retaliated against her for supporting claims of gender based discrimination and sexual harassment, in her capacity as the EEO officer at LMHA. The defendants moved for summary judgment arguing that Mengelkamp's actions did not qualify as protected activity under Title VII, since they were undertaken before a formal EEOC charge was filed. The district court denied the motion and instructed the jury that in order the prevail on her claim Mengelkamp was required to prove that she "engaged in conduct protected by Title VII... by investigating and making recommendations regarding" such claims.

> **Did the district court err in instructing the jury that Ms. Mengelkamp was engaged in conduct protected by Title VII by investigating and making recommendations regarding claims of gender discrimination and sexual harassment, even though there was no pending EEOC charges filed at the time.** (And as a related matter: Is the district court's ruling denying the defendants' summary judgment motion on this same issue even reviewable on appeal.)

### II.

Trial went forward on both the federal and state claims of retaliatory discharge and though these claims mirror one another, available damages are different under Title VII versus the state cause of action at least with regard to how they are capped. The defendants object as to how the jury was instructed, since interrogatories were never submitted to the jury inviting a delineation between back pay, front pay and compensatory damages. However, since caps do not apply to the state claim the district court had the discretion to instruct without inviting such a breakdown .

**Did the district court err to the prejudice of the defendants in deciding not to submit interrogatories to the jury to delineate between back pay, front pay, and compensatory damages, and was the verdict as to compensatory damages supported by the weight of the evidence.**

**III.**

**Was the punitive damage award against the Defendant, Steven Knotts, sustained by the evidence?**

**IV**

**Did the district court err by denying the defendants post-trial motions to alter or amend the judgment, or for new trial.**

## STATEMENT OF THE CASE

### A. Nature of the Case

This case is a wrongful discharge claim, alleging that Linda Mengelkamp was terminated as an employee of the Lake Metropolitan Housing Authority in retaliation for her support of claims of gender based discrimination and sexual harassment, in her capacity as the EEO officer at LMHA. [Complaint, RE 3, Page ID # 33-47, ¶ 5 and ¶26] [Testimony of Mengelkamp, Transcript Vol.1 , RE 100, Page ID # 1852-2102, p. 77.] In that capacity, she both investigated such claims and made recommendations in opposition to practices she viewed as being unlawful. And by her diligence in conducting these investigations and in making

objective recommendations addressing the merits of these claims, she incurred the displeasure of her direct supervisor and the Executive Director of the agency, Steven Knotts, who determined to fire her as a result. [Complaint, RE 3, Page ID # 33-47, ¶21.] The complaint sounds in both federal and state law, pleading Ms. Mengelkamp's cause under 42 U.S.C. §2000e-3 (Title VII), and under O.R.C. §4112.02 (Ohio Civil Rights Act). As the case went to trial, there were two remaining defendants: Lake Metropolitan Housing Authority, as the employer, and Steven Knotts in both his individual and official capacity.

**B. Course of Proceedings**

Ms. Mengelkamp filed her complaint on November 30, 2011, after she had received her 90 day right to sue letter from the Ohio Civil Rights Commission on September 7, 2011. In addition to the wrongful discharge / retaliation claim referenced above, the complaint originally included claims of impairment of constitutional right of free speech, denial of due process and breach of contract. [Complaint, RE 3, Page ID # 33-47]

Following discovery on May 29, 2012, Lake Metropolitan Housing Authority (hereinafter referred to as "LMHA") and Steven Knotts filed Motion for Summary Judgment. [Motion for Summary Judgment, RE 31, Page ID # 151-170] In making her response to this motion Mengelkamp limited her case to the

wrongful discharge / retaliation claim outlined above, abandoning all other claims. [Brief in Opposition to Motion for Summary Judgment, RE 33, Page ID # 614-633] The district court ruled on the motion on September 5, 2012, [Opinion and Order on Motion for Summary Judgment, RE 59, Page ID # 1521-1528], denying the summary judgment on the remaining claim, and the case went forward to jury trial, on the wrongful discharge / retaliation claim, on September 10, 2012.

At time of final pretrial, the parties entered into a formal stipulation, as part of the Final Pretrial Order, stating that the action would go forward for alleged violation of Mengelkamp's rights under both federal and state law. [Final Pre-Trial Brief and Stipulations, RE 57, Page ID # 1511-1516]

Trial went forward on September 10, 2012 and lasted two days. At the close of the case, the district court instructed the jury as to the elements of plaintiff's cause of action, using Title VII as the reference. [Transcript Vol 2, RE 101, Page ID # 2103-2226, p. 335] Neither party objected . During the charging conference with counsel, the district court indicated on the question of the punitive damage claim against Mr. Knotts, that though it did not find evidence of "individual malice" it would instruct on punitive damages using the "reckless indifference" standard. [Transcript Vol 2, RE 101, Page ID # 2103-2226, p. 322] The only objection from the defense was that since there was no evidence as to Mr. Knotts'

financial condition punitive damages could not reasonably be assessed. [Transcript Vol. 2, RE 101, Page ID # 2103-2226, p. 323]

Following the court's charge to the jury, counsel for defense objected to the charge on retaliation, where the district court had instructed that in proving such a claim plaintiff could be found engaged in protected activity if she was investigating and making recommendation as to complaints of gender based discrimination or sexual harassment in her capacity as the defendant's EEO officer. [Transcript Vol. 2, RE 101,Page ID # 2103-2226, pp. 346-347] They also objected to the district court's interrogatory on compensatory damages, since it did not invite the jury to separate back pay, front pay and compensatory damages, but instead simply asked the jury to state the total of these awards. [Transcript Vol. 2, RE 101,Page ID # 2103-2226, p. 348] At no time did the defendants ever make a motion for directed verdict under FRCP 50(b).

The jury deliberated and came back with a verdict of $195,000 in compensatory damages, along with $105,000 in punitive damages against Steven Knotts.

Thereafter, the defendants filed a motion to alter or amend the judgment under Rule 59(e) and a motion for new trial under Rule 59(a), both of which were denied. This appeal followed.

## STATEMENT OF FACTS

Linda Mengelkamp was the Administrative Office Manager for the defendant Lake Metropolitan Housing Authority (hereinafter referred to as LMHA) from September of 2009 until she was summarily terminated on May 17, 2010. [Transcript Vol. 1, RE 100, Page ID #1852-2102, pp. 74 and 100; Final Pretrial Order, RE 57, Page ID # 1511-1516, p.3] As such, in addition to her other responsibilities, she was the agency's human resource coordinator and the agency EEO officer.[Transcript Vol. 1, RE 100, Page ID #1852-2102, p. 77; Final Pretrial Order, RE 57, Page ID #1511-1516, p. 3; Plaintiff's Exhibit 9, LMHA Description "Administrative Office Manager", Appellee's Appendix, pp 23-26].

Ms. Mengelkamp's direct supervisor was the Executive Director of the agency, defendant Steven Knotts. [Transcript Vol. 1, RE 100, Page ID # 1852-2102, p.75; Final Pretrial Order, RE 57, Page ID # 1511-1516, p. 3] At all times pertinent in this case, he was the "decision maker" who both evaluated Ms. Mengelkamp's performance, and who ultimately decided to terminate her employment, ostensibly on the grounds of "abuse of trust". [Transcript Vol. 1, RE 100, Page ID # 1852-2102, p.243; Plaintiff's Exhibit 6a, Corrective Action Notice of May 17, 2010, Appellee's Appendix, pp. 1-4] However, in a performance appraisal of her work, completed on March 8, 2010, Mr. Knotts gave her the

highest possible rating, 100 out of a possible 100 points, and stated that she exceeded all performance expectations, including her interpersonal relationship and communication skills. In fact, he rated her as one of the most organized professionals he had ever worked with. [Transcript, Vol. 1, RE 100, Page ID # 1852-2102, p. 192; Plaintiff's Exhibit 11, Mengelkamp's Performance Review on 3/8/2010, Appellee's Appendix, p. 35]

But days after this appraisal, things began to go south between Ms. Mengelkamp and Mr. Knotts.... and it is all in the context of her human resource responsibility for investigation of gender based discrimination claims and sexual harassment claims within the workplace. On March 10, 2010, a management level employee of the agency, Patricia England, demanded a meeting between herself, Steven Knotts and Linda Mengelkamp, in which she made the charge that Mr. Knotts treated her differently and acted aggressively toward her in staff meetings because she was a woman. When Mr. Knotts asked for Ms. Mengelkamp's comment, she stated that she agreed with Ms. England that the director's behavior towards Ms. England was offensive and unwarranted. Though no further investigation or follow-up was done over this matter, Ms. Mengelkamp placed a memorandum memorializing the incident in Ms. England's personnel file. [Testimony of England, Transcript, Vol. 1, RE 100, Page ID # 1852-2102, pp.

32-36; Plaintiff's Exhibit No. 7, Memo to England Personnel File in re complaint as to Knotts, 3/10/10, Appellee's Appendix, p. 22; Testimony of Mengelkamp, Transcript,Vol 1, RE 100, Page ID # 1852-2102, pp. 85-90].

Then, on April 29, 2010, there was an incident in which an agency employee, Erica Peavy, was sexually harassed by outside vendor, a Mr. Gleason, who was on the LMHA premises to train staff as to financial software used by the agency. The incident occurred following a staff meeting at the agency, and Ms. Peavy reported that another LMHA employee, Thomas Huth, had witnessed the incident. Ms. Peavy immediately took her complaint to Ms. Menglekamp, who then went directly to Mr. Knotts' office. [Testimony of Peavy, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 56- 58.] At that moment, he was having a meeting with Mr. Gleason and Mr. Huth, but she interrupted and told Mr. Knotts she needed to speak with him immediately. He dismissed Gleason and Huth from his office, and Ms. Mengelkamp then told him of the allegation and stated that he needed to escort Gleason off the property immediately. Instead, after Ms. Mengelkamp had gone back to her office, he pulled Mr. Gleason and Huth back into his office and had a closed door meeting with them alone for the next 15 minutes. Ms. Mengelkamp was not invited into this meeting. Mr. Knotts then went to Ms. Mengelkamp and based on his private discussion with Gleason and Huth, he stated that he did not agree with the statement that was being made. He

then asked Ms. Mengelkamp if she wanted to come into his office and meet with them. Ms. Mengelkamp told him it was too late for that, since he had already met privately with the accused and the one witness to the event, giving the impression, even if not true, that "the guys have already talked" and had opportunity to get their story straight. It was only then that Mr. Knotts escorted Gleason off the property. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 91, 92, 122-125]

As the agency's EEO officer, it was Ms. Mengelkamp's responsibility and not Mr. Knotts' to investigate the Peavy complaint, which she did over the next two weeks. However, as time went by, she was increasingly pressed by Mr. Knotts over the investigation. The tension that was growing between Knotts and Ms. Mengelkamp as she attempted to fulfill her responsibility can be demonstrated by a review of the email exchanged between them from May 3 through May 12, 2010. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 93-96; Plaintiff's Exhibit 13, Email chain in re Peavey Investigation]

Ms. Mengelkamp finalized her investigation and made her written report with recommendation for remedial action on May 12, 2010. [Plaintiff's Exhibit 14, Final Remedial Action Recommendation, Appellee's Appendix, pp. 39-41] But two days earlier, on May 10th, she had presented a draft of the report to the agency's outside contractor on personnel matters, Clemans-Nelson and Associates.

That draft contained pointed criticism of how Mr. Knotts interjected himself into the process, jeopardizing at least the appearance of impartiality that should be expected in an EEO investigation. [Plaintiff's Exhibit 14a, Drafts and email chain with Conley on Remedial Action, Appellee's Appendix, p. 50] At the urging of Sandy Conley, with Clemans-Nelson, Ms. Mengelkamp agreed to speak with Mr. Knotts about how his actions put the agency at risk, but to take the written criticism out of her report. Accordingly, on May 11, 2010, she went over the details of the final report with Mr. Knotts and in the process verbally told him of her concern that his actions during this investigation had put the agency at risk. He was defensive immediately, declaring that here again the attempt was to find fault with him. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 96-100.]

Within four days of her discussion with Knotts over her conclusions and recommendation, Mr. Knotts moved to terminate Ms. Mengelkamp. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, p. 100] This is reflected in his email to Sandy Conley (of Clemans Nelson), dated May 15, 2010, where he discussed his plan to get rid of both Ms. Mengelkamp and Patricia England by the following Monday, May 17, 2010. [Plaintiff's Exhibit 15, Knotts email to Conley, May 15 "gender issue", Appellee's Appendix, p. 51] The email also reflects Mr. Knotts' actual frame of mind toward the investigations and Ms.

Mengelkamp as she conducted them ... as he refers to the "gender issue" or "male v. female" issue as "false claims being made by folks here". The presence of such bias towards these claims in the very email where he is coordinating Ms. Mengelkamp's discharge not only establishes a prima facie case... it rebuts any attempt to explain away the discharge as somehow justified on another basis.

Moreover, Knotts' willingness to punish Mengelkamp for giving credence to these "false" claims is consistent with his history of taking punitive action against those who crossed him, irrespective of their rights. In discussions with Mengelkamp in the past, over terminating certain employees who might be protected by workers compensation or some other concern, he had frequently expressed his view that if they had rights they could enforce them afterwards. As he put it "I don't care if they lose their house. Let them fight from the curb." [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 80-81.]

When Ms. Mengelkamp was terminated on May 17, 2010, she was presented with a "Notice of Corrective Action", written by Mr. Knotts which purported to set forth the reasons for her firing. [Plaintiff's Exhibit 6a, Corrective Action Notice of May 17, 2010, Appellee's Appendix, pp. 1-4] Within this document, Knotts attempted to make the case that the termination was for failure to perform, in that she was charged with allowing a hostile work environment to take hold, was

grossly insubordinate to his authority. Tellingly, however, even in this attempt to justify his decision he betrays his animus toward Ms. Mengelkamp for her opposition to him when dealing with gender based claims of discrimination. He writes: "The most recent allegation that I treat women differently than men was clearly incorrect at that time, and now it is clear that you were supporting the HCV Manager and working together to undermine me... you allowed her ridiculous and unsubstantiated claims against me to drain time and resources from the Authority.... I fail to see any base for the claim that I treat males differently than females." [Plaintiff's Exhibit 6a, Corrective Action Notice of May 17, 2010, Appellee's Appendix, p. 2, ¶ 4]

Attached to the Notice were statements ostensibly provided by other LMHA employees of their own initiative, presented as foundation for the claim set forth in the Notice that Ms. Mengelkamp had betrayed the confidences of employees who had confided in her as the human resources officer at LMHA, and had otherwise acted unprofessionally or with disrespect toward them. [Plaintiff's Exhibits: Ex. 6b Statement of Melissa Martin, Appendix, pp.5-6; Ex. 6c Statement of Kristin Srpan, Appendix, pp 7-8; Ex. 6d Statement of Linda Ilacqua, Appendix, p. 9; Ex.6e Statement of Holly Hannah-Coe, Appendix, pp. 10-13; Ex. 6f Statement of Gretchen Molnar, Appendix, pp. 14-18; Ex. 6g Statement of Michael Cody, Appendix, pp. 19-21]

But each of these witnesses testified at trial, and as to the one hard allegation made in their statements, all save but one admitted that they had no knowledge of any occasion where Ms. Mengelkamp ever betrayed a confidence. [Testimony of Martin, Transcript Vol 2, RE 101, Page ID # 2103-2226, p. 266; Testimony of Srpan, Transcript Vol 2, RE 101, Page ID # 2103-2226, p. 314-315; Testimony of Hannah-Coe, Transcript Vol. 2, RE 101, Page ID # 2103-2226, p. 310; Testimony of Molnar, Transcript Vol 2, RE 101, Page ID # 2103-2226. pp. 257-259]

The one witness who testified that in fact Ms. Mengelkamp had betrayed a confidence was Linda Ilaqua. But upon further inquiry, she admitted that it was Mr. Knotts who disclosed her complaint to her supervisor, not Ms. Mengelkamp. . [Testimony of Ilacqua, Transcript Vol. 2, RE 101, Page ID # 2103-2226, pp. 294-296]

The statements themselves bear a striking resemblance to one another. Upon review, they are overwhelming devoted to complaints about Patricia England, not Ms. Mengelkamp and all of their statements were gathered over a four day period, from May 10th through May 13th. The circumstantial evidence all points toward a top-down orchestration of the creation of these statements, and belies the defendants' characterization of them as being spontaneous or unsolicited.

And in at least the instance of Gretchen Molnar, the evidence is that she was intimidated into making her statement. As she stated at trial, she was contacted at

home by Melissa Martin who not only encouraged her to send Knotts her complaint but who also stated that her job could be in jeopardy. This not-so-subtle hint frighted Ms. Molnar, and as a result she offered her statement. [Testimony of Molnar, Transcript Vol. 2, RE 101, Page ID # 2103-2226, pp. 258-259.]

On the day of her discharge, Mengelkamp was put through great emotional distress and humiliation over the loss of her position. She testified at trial that she cried all the way home, and for days afterwards. She had to explain to her son and her husband why she had been terminated, and she couldn't. She had to return to LMHA two times following her discharge, and confront former colleagues, before they gave her the termination documents and notice of corrective action. It was a period of acute distress. She suffered migraine headaches and had difficulty sleeping. And for six months, she struggled with feeling very sad and depressed. These feelings and this suffering did not abate until she was able to secure new employment, with the Christopher Group. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 114-118.]

At trial, Ms. Mengelkamp also testified as to the financial burden and loss caused by her discharge. At the time, she was paid an annual salary by LMHA of $46,000. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, p. 84] LMHA also provided her with medical coverage for herself and her family, for which she paid $55 every two weeks. She also had pension benefits

through Ohio Public Employees Retirement System. Her husband's employment does not provide medical coverage or pensions benefits for its employees. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 74 -75] So when she lost her job with LMHA not only did she lose her salary... she and her family also lost all medical coverage and the security of having a pension plan.

When she re-secured employment with her new employer the Christopher Group, she started with a base salary of $40,000 but with bonuses her earnings could go up. No medical benefits were offered. When LMHA terminated her the annual cost, through COBRA, of continuing their medical coverage was $14,048. Since she could not afford that, she obtained cut rate private insurance, to the best of her ability, which originally cost $520/ mo. in 2011. But by 2012, they could not keep up with premium increases and had to cut back on coverage still further, which lowered the premium to $450/mo. The only pension benefit offered by the Christopher Group is a 401(k) plan but because she is paying for her health coverage she cannot afford to participate. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 111 to 113] In the first full year of her employment with the Christopher Group, 2011, she earned $54,580.

At trial, plaintiff presented two expert witnesses addressing the extent and value of the lost wages and benefits in this case. The first was David Kokoski,

who is an expert in vocational evaluation, and familiar with labor market analysis to determine whether or not particular jobs are available in a given market, for a person with a particular skill set by way of their own education and experience. [Testimony of Kokoski, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 141-143.] He testified that based on Ms. Mengelkamp's skill set, you cannot expect her to secure a job in our area that will pay health care benefits comparable to what she had at LMHA for another seven years. He further testified that it is highly probable that she will never find a job that will offer comparable pension benefits. [Testimony of Kokoski, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 146-147.]

The other expert was Dr. James Zinser, Ph.D., an economist who was presented to quantify the value of these lost benefits, together with the wage loss. His testimony was that the past wage loss, through September, 2012 (time of trial) was $9,838. Additionally, the value of the past loss of health insurance and pension benefit was $38,452, for a total past loss through September of $48,289. He further testified as to the value of the ongoing loss of the health insurance and pension benefits. He testified that the loss of the health insurance benefit over the next seven years represents a present value of $58,467. And taking the loss of pension benefits out for the same seven years, he calculated that loss as being $10,732. So the total loss in hard economic terms came to $117,488. [Testimony

of Zinser, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 164-176.] The defendants presented no witnesses of their own to challenge this evidence.

## SUMMARY OF ARGUMENT

The defendants claim that the district court erred when it instructed the jury that Ms. Mengelkamp's case rested on the charge that the defendants retaliated against her because she had *opposed* unlawful discrimination. They object to the instruction because it states that she was engaged in protected activity while *"investigating and making recommendations"* concerning complaints of gender discrimination and sexual harassment. They argue that the complaint sounded a cause of action based not on "*opposition*" to discrimination, but only on allegations of retaliation for "*participating*" in investigations of discrimination, and since such investigations were not done in the context of any pending EEOC claims they were not protected activity under Title VII.

The district court was not in err, however, and ruled properly in the context of the evidence before it at trial. Though it may well be true that in many cases investigations undertaken in-house, before formal proceedings are begun at the EEOC level are not protected activity, each case must turn on its own facts. Here, Ms. Mengelkamp was diligently doing her best to fulfill her responsibilities as the EEO officer investigating charges of gender discrimination and harassment. Moreover, in the process of trying to insure that these charges were treated

seriously and fairly she stood up to her supervisor, defendant Knotts, informing him of her view that he was acting out of line in treating one female manager differently than he treated male managers, and in the last incident pushing for full investigation of a sexual harassment complaint even after defendant Knotts indicated he did not believe the allegations, and then subsequently cautioning him over actions he undertook that could be viewed as tainting the investigation.

The defendants also object to the district court's instruction on damages, since the court refused to submit interrogatories to the jury delineating between back pay, front pay and compensatory damages. Instead, the court allowed the jury to fill out only one interrogatory on non-punitive damages, wherein the jury simply stated a singular amount to cover all three of these categories. The court did not err in this approach, at least not to the prejudice of the defendants in this case, since the jury award for these harms, nominated on the jury interrogatory as compensatory damages, was $195,000. This was consistent with and supported by the evidence at trial and well within any caps governing the state cause of action. The only cap under Ohio law that might have come in play would be as to non-economic damages... for pain and suffering.... and that may be capped under state law as low as $250,000. Ohio Revised Code §2315.18(B)(2). Since that cap was not exceeded delineating between the three various categories of harm within the unified interrogatory would be meaningless.

The final issue was that appropriateness of punitive damages in this case, and whether that award was as to the Ohio cause of action, since the jury was instructed that punitive damages could only be awarded if they found that defendant Knotts acted with "reckless indifference to the plaintiff's federally protected rights." Punitive damages may be awarded where the defendant's actions are egregious and outrageous, and the actions of defendant Steven Knotts are sufficient to meet this standard. Further, both Ohio law and federal law mirror one another on this issue, so that it was proper for the district court to treat the award as being on the Ohio cause of action. And under Ohio law, the award is only limited by its reasonableness, which as to its amount is not even challenged by the defendants.

## ARGUMENT

### I. The district court did not err in instructing the jury that Ms. Mengelkamp was engaged in conduct protected by Title VII by investigating and making recommendations regarding claims of gender discrimination and sexual harassment, even though there was no pending EEOC charges filed at the time.

*Standard of Review*

In the Sixth Circuit, it is well established that jury instructions are reviewable as a whole and that an issue as to the instructions is a question of law that is reviewable *de novo*. The standard on appeal is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.

However, a district court's refusal to give a specific requested jury instruction is reviewed under the abuse of discretion standard. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir., 2005); *Fisher v. Ford Motor Co.*, 224 F.3d 570 (6th Cir., 2006).

*Law and Argument*

**A. As a preliminary matter, the district court's ruling denying the defendants' summary judgment motion on this same issue is not reviewable on appeal**

The First Assignment of Error set forth by the defendants is their objection to the ruling of the district court even before trial, denying their motion for summary judgment on the issue of whether Mengelkamp was engaged in "protected activity" such that she could even make a claim of retaliatory discharge under the law. Their motion argued that the complaint only alleged the Mengelkamp participated in internal investigations of discriminatory claims, before any formal EEOC charges were made, and as such they lay outside the protection provided by Title VII against retaliatory discharge. [Motion for Summary Judgment, RE 31, Page ID # 151-170] The district court denied the motion, ruling that Mengelkamp's investigations "*and her efforts to stem and remedy* gender discrimination and sexual harassment at LMHA... are properly characterized as opposition to unlawful practices" , and therefore qualified as protected activity. [Opinion and Order, RE 59, Page ID # 1521-1528]

A full trial on the merits followed, with verdict for the plaintiff. In *Ortiz v. Jordan et. al.*, 562 U.S. ___ (2011) the Supreme Court has recently held that "A party may not appeal a denial of summary judgment after a district court has conducted a full trial on the merits." In that case, the court also noted that once the case proceeds to trial the full record developed in court supercedes the record existing at the time of the summary judgment motion. *Ortiz*, supra at pg 3.

The defendants First Assignment of Error is without merit and all reference within their Brief to affidavits or depositions not relied upon at trial should be ignored.

**B. The district court correctly instructed as to the issue of "protected conduct" and how it could be established as a necessary element of plaintiff's retaliation claim.**

The portion of the court's instruction that the defendant's Second Assignment of Error is based on reads as follows:

> "Now, the plaintiff Mengelkamp claims that the defendant discriminated against the plaintiff because the plaintiff had opposed a practice made unlawful by Title VII of the Civil Rights Act of 1964. In order to prevail on this claim the plaintiff must show all of the following:
>
> First, that the plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964 by investigating and making recommendations regarding Patricia England's complaint of gender discrimination and by investigating and making recommendations concerning Erica Peavy's complaint of sexual harassment or both of these complaints.

> Linda Mengelkamp need not prove that the claims of employees England and Peavy were actually true. She must only prove that she was acting... under a good faith belief.... that England may have been the victim of gender discrimination or that Peavy may have been the victim of sexual harassment at LMHA.....
>
> [Jury Instruction, Transcript Vol. 2, RE 101, Page ID # 2103-2226, pp. 334-335]

The basic objection of the defendants is that the instruction "blurred the line" between the opposition and participation clauses" of Title VII for the purposes of proving that plaintiff was engaged in protected activity.[1] They argue that in pleading her retaliatory discharge claim the only explicit charge made was that Mengelkamp was discharged for her role in *investigating* charges made by England and Peavy, who never filed any charges with the EEOC. Defendants complete their argument by contending that since the Sixth Circuit does not recognize internal investigations occurring outside the ambit of a filed EEOC charge as protected activity, the actions of the plaintiff here never qualified as "protected" activity and cannot give rise to any claim for retaliation. [2]

---

[1] The opposition and participation clauses are set out as two separate branches in the definition of protected activity under Title VII, 42 U.S.C. 2000e-3 which states in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against.... any individual... because he has <u>opposed</u> any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or <u>participated</u> in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 20003-3.

[2] Defendant's Proposed Jury Instruction No. 8, [RE 49, Page ID # 1432-1453, p. 12], would have required the jury to find that Mengelkamp participated in an investigation "conducted pursuant to an ongoing EEOC claim". Since there never

The first response to this argument is to point out that the complaint filed in this case not only alleged that Mengelkamp investigated these charges, it also specifically stated that this action was brought for retaliation for *support* of claims of gender based discrimination and sexual harassment." [Complaint, RE 3, Page ID # 33-47, ¶ 5 and ¶26] Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a complaint set forth "... a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose is to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Conley v. Gibson*, 335 U.S. 41, 47 (1957). The complaint in this case fulfilled that purpose and gave fair notice that Mengelkamp's actions resulting in retaliation went beyond simply conducting internal investigations.

And certainly no one can claim surprise over this assertion by time of trial. When the district court denied defendants' motion for summary judgment it explicitly found that "Both federal and Ohio law prohibits an employer from discriminating against an employee for opposing sexual harassment or gender

---

was an EEOC claim the giving of this instruction would have been tantamount to directing the jury to find for the defense. Which raises this point: the appellants' arguments as to these jury instructions is really a re-advancement of the argument they lost when the court denied them summary judgment. To preserve the argument they needed to move for a directed verdict as a matter of law, pursuant to FRCP 50(b). At no time did the defendants ever make such a motion. Since this is a "sufficiency of the evidence" issue their failure to raise is it under Rule 50(b) amounts to a failure to preserve the issue for appellate review. *Ortiz v. Jordan*, 562 U.S. ___, (2011).

discrimination in the workplace. Mengelkamp says Defendants fired her for opposing just such practices." [Opinion and Order, RE 59, Page ID # 1521-1528, p. 3]. And in pointed response to the same argument defense is advancing here, trying to limit plaintiff's claim to her "participation" in an internal investigation, the district court found the defense's view of the case too narrow. Rejecting their fixation on the participation clause the court stated that ".... Mengelkamp's investigation and, more importantly, her efforts to stem and to remedy gender discrimination and sexual harassment at LMHA – including by threatening Defendant Knotts with an EEOC filing – are properly characterized as "opposition" to unlawful employment practices." [Opinion and Order, RE 59, Page ID # 1521-1528, p. 6]

This then was the posture the case was in at the beginning and it was the way the case was presented to the jury at the close, when the court instructed them that plaintiff's conduct "investigating and making recommendations" regarding the England and Peavy claims qualified as "protected activity" under Title VII. [Jury Instruction, Transcript Vol. 2, RE 101, Page ID # 2103-2226, pp. 334-335] The case went forward on the basis that plaintiff was engaged in protected activity because of her opposition to unlawful employment practices. The fact that this opposition took place as an outgrowth of internal investigations conducted by Mengelkamp is a matter of circumstance. But there is no valid reason to conclude

that conducting an investigation and opposing unlawful activity are mutually exclusive activities.

The second point to be made in response to the argument raised here is that activities properly within the scope of the opposition clause are universally acknowledged to be protected activities under Title VII whether or not formal charges of discrimination have been filed with the EEOC. *Sumner v. United States Postal Service*, 899 F.2d 203 (2nd Cir., 1990); *Harker v. Utica College of Syracuse Univ.*, 885 F. Supp. 378 (N.D.N.Y., 1995). *Sawicki v. American Plastic Toys Inc.*, 180 F. Supp.2d 910 (E.D.Mich., 2001). It simply is irrelevant in a case founded upon "opposition" that such charges have not been filed.

Thirdly, in order to invoke protection under the opposition clause, Mengelkamp does not have to prove that the conduct or policy she opposed was in fact an illegal employment practice. As is stated in *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989), also cited in the defendants' Brief, "A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact unlawful; he or she must only have a good faith belief that the practice is unlawful."

Several of the cases cited in support of the defendant's argument are inapposite because they all arise from fact patterns where the "participation clause", not the "opposition" clause", was at issue, and so they are of little

guidance when applied to the Mengelkamp situation. Included in this group are the decisions in *Abbott v. Crown Motor Co.*, 348 F.3d 537 (6th Cir. 2004); *Veal v. Upreach LLC*, 2011 Ohio 5406 (Ohio App., 10th Dist., 2011); and *Morris v. Boston Edison Co.*, 942 F. Supp. 65 (Dist. Ct., D. Mass.)(1996).

As for the other authorities relied upon by the defense, where the "opposition clause" was indeed the central focus of the court's inquiry, they are all distinguishable on their facts or have since been overtaken by more recent precedent. In *Wells v. Securities Services, U.S.A., Inc.*, 07-15500 (E.D. Mich. 2009)(Unreported. Addendum to Appellants Brief) the plaintiff was a security guard who only relayed information from a woman who was being harassed to her employer (not his) as to her concerns. The court held that Wells was not entitled to protection under the "opposition clause" because his actions did not indicate personal opposition to perceived sexual harassment. Similarly in *Sawicki v. American Plastic Toys, Inc.*, 180 F.Supp.2d 910 (E.D. Mich. 2001) the plaintiff was a group leader who typed up and delivered a charge of sexual harassment signed by four other women who worked her shift. She never signed the letter, and she never herself indicated she would take steps on her own, such as contact an attorney. Under those circumstances, the court ruled there was no evidence the plaintiff was engaged in any protected activity under the opposition clause. And in *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir 1989) the

plaintiff had sent a letter to the company's head of human resources, prior to being demoted, blaming all his alleged performance problems on a supervisor who was racist. Following his demotion, plaintiff brought this retaliation case under Title VII and Michigan state law, contending that his letter qualified as opposition to unlawful activity. The court rejected his claim, holding "that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."

Some of the case law implies that in order to qualify as opposition to unlawful activity the plaintiff must establish some active and consisted resistance or opposition to the situation. *Sawicki*, supra might be an example. Another, that is cited by the defense is *Muir v. Chrysler LLC*, 563 F.Supp.2d 783 (N.D.Ohio 2008). In that case, the plaintiff was a union shop steward who assisted UAW members in sending a written complaint to offices by supplying them with addresses. He was later disciplined for disclosing the addresses. As a result, he filed suit claiming relation under Title VII. He claimed that his assistance in providing the mailing addresses was so closely aligned with the process that it constituted participation in objecting to discriminatory practices. The court rejected the claim, finding that supplying addresses was "too slender a thread" upon which to base a claim of protected activity. The court opinion stated that sharing a list of addresses "does not meet the standard of "active, consistent 'opposing' activities". But since *Muir*

the Supreme Court has specifically struck down this view. In *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 555 U.S. ____ (2009) the court took up the issue of whether Title VII protection against retaliation extends to an employee who spoke out about discrimination not of her own initiative, but only in answering questions during an employer's internal investigation. In her response, she stated that she had been sexually harassed by the school district's employee relations director. She was subsequently discharged. Both the district court and the Sixth Circuit Court of Appeals had sustained summary judgment in favor of the defendant, relying on the same standard of active and consistent opposition as was set forth in *Muir*, supra. In reversing the decisions of the lower courts the Supreme Court held that 'Oppose' goes beyond active, consistent behavior in ordinary discourse, and may be used to speak of someone who has taken no action at all to advance a position beyond disclosing it. Thus, a person can 'oppose' by responding to someone else's questions just as surely as by provoking the discussion." In its opinion, the court pointed out that the demand made below... a showing of active, consistent behavior in opposition... undermined the "primary objective" of Title VII of "avoiding harm" to employees. *Crawford*, supra. The court also pointed out the danger inherent in the position of the lower courts, noting that if the law truly provided no protection for an

employee answering questions during an internal investigation it would give good reason to prudent employees to keep their mouths shut.

This same logic applies to the present case. Here we have a plaintiff who was the employer's EEO officer. As she fulfilled her responsibilities to address claims bought to her by Patricia England and Erica Peavy, she did not hesitate to objectively stand up and express her opposition to perceived unlawfulness. In the instance of Ms. England's complaint of gender based discrimination, Ms. Menglekamp spoke directly to Knotts during her meeting with England and Knotts, telling him she agreed with England that his behavior towards her was offensive, warranting the filing of an EEOC charge if it did not change. [Testimony of Mengelkamp, Transcript Vol.1, RE 100, Page ID # 1852-2102 pp. 85-90] And certainly during her investigation of the Peavy complaint of sexual harassment, Ms. Mengelkamp did not hesitate to speak up in the interest of fairness. When Knotts tried to minimize the complaint, telling Mengelkamp he had met with the person alleged to have harassed Peavy and that he "did not agree with the statement that was being made", Mengelkamp immediately warned him that his actions were tainting the investigation of the charge. Mengelkamp then went forward and conducted a thorough investigation, undaunted by Knotts, and did her best to ensure that unlawful conduct was addressed. [Testimony of

Mengelkamp, Transcript Vol.1, RE 100, Page ID # 1852-2102, pp. 92, 95, 122-125.]

The evidence of Mengelkamp's opposition to unlawful discrimination goes far beyond merely giving a statement or providing assistance in support of a charge. As the EEO officer handling these charges, she had to risk incurring the wrath of the agency's executive director and her immediate supervisor, Mr. Knotts. If the Supreme Court in *Crawford*, supra., had concerns over the chilling effect of not extending opposition clause protection to employees answering questions during internal investigation, so much greater should be the concern over leaving the EEO officer herself exposed, without any recourse from a punitive employer unhappy with her determination to be fair and objective .

Defendants' Brief cites only one case where the plaintiff's claim to protection under Title VII arose out of her activity as her employer's EEO officer. In *Holden v. Owens Illinois, Inc.*, 793 F.2d 745 (6th Cir., 1986) plaintiff had been discharged after aggressively pushing for adoption of an effective affirmative action program that would comply with Executive Order 11246. The holding of the court was that the plaintiff's actions to promote affirmative action were not protected under the opposition clause. The court reasoned that on its face 42 U.S.C. §2000e-3(a) only protects opposition to practices that violate Title VII and although Executive Order No. 11246 requires governmental contractors to

establish affirmative action programs, Title VII does not mandate the implementation of affirmative action.

But recognizing that Title VII does not demand affirmative action is a far cry from saying that Title VII does not demand equal treatment and fundamental fairness. Mengelkamp's actions were indeed undertaken in her capacity as the defendants' EEO officer, but unlike the EEO officer in *Holden*, they were done as she diligently tried to fulfill her responsibility to address charges of gender discrimination and sexual harassment. If coming forward and giving testimony during an internal investigation of sexual harassment is to be treated as protected activity under the opposition clause... which was the Supreme Court's holding *Crawford*, supra.... then reason dictates that the EEO officer conducting such investigation must be equally protected. To hold otherwise would undermine the integrity of the internal claims procedure envisioned when Executive Order 11246 created this role of EEO officer in the first place. That can't be consistent with the basic purpose of Title VII.

## II. The district court did not err to the prejudice of the defendants in deciding not to submit interrogatories to the jury to delineate between back pay, front pay, and compensatory damages.

*Standard of Review*

Plaintiff accepts the defendants' statement of review on this issue: a district court's decision to submit a proposed interrogatory to the jury is reviewable under an abuse of discretion standard.

*Law and Argument*

To begin with, the objection raised by the defendants here is to Jury Interrogatory No. 4, which lumps compensatory damages, back pay and front pay together and asked the jury only to give one total sum to cover those damages. There is no objection to the actual jury instruction given which, by the defendants own admission, properly instructed the jury that they were to be calculated separately.

On one level then, the problem defendants have is one of form, rather than substance. Use of the term "compensatory damages" as used in the Interrogatory to cover all three of these separate categories may not be technically correct under Title VII, but it is consistent with Ohio law. But in either case, so long as the jury was properly instructed as to what to consider, there is no harm in the simplified approach taken by the district court. So long as the instructions... together with the interrogatory... adequately inform the jury of the relevant considerations there is no reason to challenge the court's discretion. *Fisher v. Ford Motor Co.*, 224 F.3d 570 (6th Cir. 2000).

The substantive argument raised by the defendants is that without this interrogatory there is no way of determining if the award for front pay was "supported by a reasonable interpretation of the evidence." As the trial court stated in reviewing defendants' post-trial motion for new trial, the defendants argument is two-pronged: first, that the lack of itemized damages precludes this Court from properly assessing the damages cap, and secondly, that front pay damages should not be allowed. The damage cap issue might apply if this case only went forward as a federal claim under Title VII, since then compensatory damages would be limited to no more than $50,000 pursuant to 42 U.S.C. §1983a(b)(3)(A). But this case did not go forward only as a federal claim. Mengelkamp also raised a corresponding claim under Ohio Revised Code §4112.02(I). And the parties in fact stipulated as part of the final pretrial order that the action would go forward under both federal and state law. [Final Pretrial Order, RE 57, Page ID # 1511-1516, p. 2]

The defendants suggest throughout their Brief that since the instructions given only referred to Title VII then one must conclude that the case was only submitted to the jury as a federal claim. Not only does this ignore the stipulation between the parties but it also does not conform to precedent of this circuit holding that instructions solely on federal claims can permit state law liability if

the instructions are sufficient. *Hall v. Consol. Freightways Corp. of Delaware.*, 337 F.3d 669, 677 (6th Cir. 2003).

Both the Ohio Supreme Court and the Sixth Circuit have recognized that a claim under Ohio Revised Code §4112 mirrors one brought under Title VII, so both can be analyzed solely under Title VII. Damages that are awarded in such an action may be distributed between the state and federal claim. *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 541 (6th Cir. 2003). Plaintiffs are entitled to elect which statute they will receive damages under, and where the state claim has no (or more liberal) damage caps the Title VII limits do not apply. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007). Ohio law caps tort recoveries for non-economic losses at $250,00 and economic losses are not capped. Ohio Revised Code §2315.18(B)(2).

That being the case it matters little that the Mengelkamp jury was not invited to break down its “compensatory” award of $195,000 into its component parts. Under any circumstance, the Ohio cap was not exceeded.

The second branch of defendant’s argument is that front pay damages should not be allowed at all. This is an attack on the weight of the evidence. Defendants argue that front pay could not be warranted because Mengelkamp secured new employment within six months of her termination, at a salary comparable to what she had made at LMHA. But at trial, Mengelkamp testified that she has neither

medical benefits or pension benefits in her new position. [Testimony of Mengelkamp, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 111 to 113] And plaintiff presented two experts who addressed the issue. David Kokoski, Plaintiff's labor market expert, testified as to how long it would take for her to find employment that would replace these benefits, and Dr. James Zinser, Ph.D. calculated the value of such lost future benefits. The total economic loss, both past and future, came to $117,488. [Testimony of Kokoski, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 146 to147][Testimony of Zinser, Transcript Vol. 1, RE 100, Page ID # 1852-2102, pp. 164 to 176.]

Defendants were free to offer their own experts or to otherwise challenge this testimony, but they decided not to do so. Now is not the time to make arguments that were never sufficiently stated or supported at trial. A jury's award is to be accorded great discretion. *Rodgers v. Fisher Body Div.*, 739 F.2d 1102, 1107 (6th Cir. 1984). The reality is that in spite of defendants' assertion to the contrary, there was ample evidence to warrant an instruction on future damages (front pay) and for the jury to consider such damages during their deliberations. The matter comes down to this: front pay or no front pay, with or without a breakdown of how the verdict was calculated, the record in this case more than supports a compensatory award $195,000, and since that amount is well within the

Ohio statutory cap no prejudice resulted from the district court's design of the jury interrogatories. The court was well within its discretion to instruct as it did.

## III. The punitive damage award against the Defendant, Steven Knotts, was sustained by the evidence.

*Standard of Review*

Plaintiff accepts the defendants' statement of review on this issue: the standard of review for an award of punitive damages is reasonableness. *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990); *Smith v. Wade*, 461 U.S. 30, 54 (1983).

*Law and Argument*

Defendants challenge the weight of the evidence supporting plaintiff's punitive damage case. They argue that in any punitive damage claim a positive element of conscious wrongdoing is always required, and they argue that Knotts cannot be said to have acted with the requisite consciousness of wrongdoing because he followed LMHA protocol and consulted with an attorney who concurred as to the decision to terminate the plaintiff.

When the district court charged the jury in this case it instructed that punitive damages would be appropriate only if "Defendant Knotts personally acted with reckless indifference to plaintiff's federally protected rights." [Transcript Vol. 2, RE 101, Page ID # 2103-2226, p. 322] The defendants never objected or raised a concern that it should go further. As it is, the instruction correctly dealt with the requisite degree of wrongdoing, emphasizing personal and reckless indifference to

the plaintiff's rights. The law does not require more, at least not in the context of this case.

The defendants' cite the court to *Kolstad v. American Dental Assoc.*, 527 U.S. 526 (1999) in support of their assertion that there must be some proof of conscious wrongdoing, and to *Farias v. Instructional Syst.*, 259 F.3d 91 (2nd Cir. 2001) to back up their related argument that as a matter of law Knotts could not be said to have such mens rea, since he acted in consultation with legal counsel. But both cases recognize that as an alternative to proving that the defendant knew it was acting in violation of federal law, "egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil' motive." *Kolstad,* supra. See also: *Smith v. Wade*, 461 U.S. 30 (1983), holding that punitive damages may be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others..." And that is just what the evidence in this case proved. As the district court stated when ruling upon defendants' motion to alter or amend judgment under Rule 59(e):

> ".... the evidence adduced at trial supports a finding that Defendant Knotts consciously disregarded Plaintiff Mengelkamp's rights. Knotts was tasked with acting upon Mengelkamp's investigations into human resources complaints, and yet still engaged in retaliatory conduct. The evidence further supports a finding that Knotts' actions were 'outrageous' and'flagrant', so as to militate against upsetting the jury's verdict. *Pelletier v. Rumpke Container Serv.,* 753 N.E.2d 958, 964-65 (Ohio Ct.App. 2001). An agency's head, investigating

> allegations of gender harassment decides to punish the messenger instead. It is not plainly erroneous to conclude that so doing constitutes outrageous behavior within the ambit of Ohio's punitive damages scheme.
> [Opinion and Order, RE 93, Page ID # 1825-1835, pg. 6.]

Under that view of the evidence , a view the jury apparently shared.... the fact that Knotts "followed protocol" and consulted with the agency's legal counsel is of little probative value. It was Knotts that was the decision maker and he was the one motivated to retaliate against Mengelkamp. [Transcript Vol.1, RE 100, Page ID # 1852-2102, p. 243] He was the one with an "evil motive". Pro forma consultations with legal will not excuse such behavior.

## IV. The district court did not err by denying the defendants post-trial motions to alter or amend the judgment, or for new trial.

### *Standard of Review*

Granting or denying a Rule 59 is within the informed discretion of the court and is reversible only for abuse. *Huff v. Metropolitan Life Ins.*, 675 F.2d 119, 122 (6th Cir. 1982).

### *Law and Argument*

The Fifth and Sixth Assignments of Error in defendants Brief challenge the district court's discretion, ruling on post-trial motions under Fed. R. 59, declining the request to grant a new trial, or to alter the judgment. To the extent these assignments of error raise the weight of the evidence as an issue, or challenge the court's instruction on compensatory damages, or the refusal of the court to cap

compensatory damages, the plaintiff has already set forth response in sections II and III of this Brief. The remaining issue, raised in the motion to alter or amend, is whether the jury's verdict of $105,000 in punitive damages against defendant Knotts should be reduced to $50,000 through the application of 42 U.S.C. §1981a(b)(3).

Defendant's argument is that the jury was only instructed on the federal punitive damage standard... "reckless indifference"...and therefore must be limited by the federal caps set forth in §1981a(b)(3). This line of reasoning depends on the validity of the assumption that if only an federal instruction is used only a federal cause of action is decided. The defense is contending that there can be no punitive verdict on the state cause arising out of such deliberation. There is no validity to this assumption. Both the Ohio Supreme Court and the Sixth Circuit have recognized that a claim under Ohio Revised Code §4112 mirrors one brought under Title VII, so both can be analyzed solely under Title VII. And the resulting verdict is as to both, and damages that are awarded may be distributed between the state and federal claim. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541 (6th Cir. 2003).

In fact, it is the law of this circuit that punitive damages should be permitted to stand under state law even though the instructions were premised on federal law. *Hall v. Consol. Freightways Corp. of Del.*, 337 F.3d 669, 677 (6th Cir., 2003).

Defendant tries to argue that the *Hall* case does not mean what it says, by making the irrelevant observation that the case was "based" on a precedent ... *Martini v. Federal National Mortgage Assoc.*, 178 F.3d 1336 (D.C. Cir. 1999)...where the jury instruction happened to address both the federal and state cause. But that is not the issue. The only relevant inquiry should be whether the state law on punitive damages is sufficiently similar to the federal so that it is fair to say they 'mirror' one another.

The district court instructed the jury here that punitive damages against Knotts would be appropriate only if "Defendant Steven Knotts personally acted with reckless indifference to plaintiff's federal protected rights." Under Ohio law, punitive damages may be recovered only upon a showing of "actual malice". *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 402 (Ohio, 1994). But "actual malice" is defined under Ohio law as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.* It is the latter prong that the court in *Hall, supra.*, assessed , and in that assessment ultimately decided that a finding of reckless indifference by a jury was sufficient to meet the definitions of actual malice under Ohio law. *Hall* merged the federal "conscious indifference" standard with the "conscious disregard" standard of *Zoppo*. It was not an abuse of

discretion for the district court here to find that "reckless indifference" could also be part of that set of synonymous phrases. And as the district court recognized, Ohio courts have permitted reckless indifference to support an award of punitive damages. See: *Ward v. Hengle*, 124 Ohio App.3d 396 (Ohio Ct. App. 1997); *Leichtamer v. Am. Motors Corp.*, 424 N.E.2d 568, 579 (Ohio 1981).

## CONCLUSION AND RELIEF REQUESTED

Title VII and Ohio Revised Code §4112 promise that employees will not be subjected to retaliation when they act to "oppose" discrimination made unlawful under those civil rights statutes. The district court was correct in its instruction to the Jury that Mengelkamp's activities in carrying out her responsibilities as the EEO officer at LMHA fell under the protection of that promise, and the fact that they took place in the context of an internal investigation, outside the framework of an EEOC action, is immaterial. They were done in opposition to gender discrimination and sexual harassment, and to insure fair and objective investigation of such complaints inspite of official resistance from her supervisor, Steven Knotts.

Knotts' move to terminate Mengelkamp was explicitly undertaken because he was upset and offended by these claims of gender discrimination and sexual harassment within the agency, and he took it out on Mengelkamp because she insisted on treating them objectively and seriously, even to the point of calling him

out on the carpet for his own lack of discretion. His decision to punish the messenger rather than deal with his own responsibilities was outrageous and egregious. His actions against Mengelkamp were undertaken with reckless indifference to her rights, protected under both federal and state law.

In every regard, the decisions of the district court and jury verdict rendered here should be sustained and left intact. Defendant/Appellee Linda Mengelkamp respectfully requests that this court affirm the decision in all respects.

Respectfully submitted,

/s/ Robert P. Sweeney

ROBERT P. SWEENEY (0026605)
ROBERT E. SWEENEY CO., L.P.A.
55 Public Square, Ste. 1500
Cleveland, Ohio 44113
(216) 696-0606 rps@rescolaw.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel for Plaintiff/Appellee certifies as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,631 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Perfect in 14-point Times New Roman.

Respectfully submitted,

/s/ Robert P. Sweeney
ROBERT P. SWEENEY (0026605)
ROBERT E. SWEENEY CO., L.P.A.
Attorney for Plaintiffs
55 Public Square, Ste. 1500
Cleveland, Ohio 44113
(216) 696-0606
rps@rescolaw.com

DATE: April 9 , 2013

## CERTIFICATE OF SERVICE

I hereby certify that on April 9 , 2013 I electronically filed the foregoing *Corrected* APPELLEE'S BRIEF with the Clerk of the Sixth Circuit Court of Appeals using the ECF system which will send notification of such filing to the following:

William P. Lang – william.lang@williamlangattorney.com

Suzanne F. Jucaitis – suzanne.jucaitis@williamlangattorney.com

Counsel for Appellants: Lake Metropolitan Housing Authority and Steven Knotts

/s/ Robert P. Sweeney
ROBERT P. SWEENEY (0026605)
ROBERT E. SWEENEY CO., L.P.A.
Attorney for Plaintiffs
55 Public Square, Ste. 1500
Cleveland, Ohio 44113
(216) 696-0606
rps@rescolaw.com

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**
**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Submitted pursuant to 6th Cir. R. 28 and 30(g)

| Record Entry # | Description | Pg. ID # |
|---|---|---|
| RE 3 | Complaint | 33-47 |
| RE 10 | Answer | 78-81 |
| RE 31 | Motion for Summary Judgment | 151-170 |
| RE 33 | Brief in Opposition to Defendants' Motion for Summary Judg. | 614-633 |
| RE 35 | Reply to Brief in Opposition | 810-827 |
| RE 59 | Opinion and Order on Motion for Summary Judgment | 1521-1528 |
| RE 57 | Final Pre-trial Order and Stipulations | 1511-1516 |
| RE 49 | Defendants' Proposed Jury Instructions | 1432-1453 |
| RE 68 | Defendants' Supplemental Proposed Jury Instruction | 1606-1607 |
| RE 69 | Defendants' Proposed Jury Interrogatories | 1608-1616 |
| RE 75 | Redacted Verdict with Interrogatories | 1631-1634 |
| RE 77 | Exhibit and Witness List prepared by Court Reporter | 1647-1655 |
| RE 78 | Judgment | 1656 |
| RE 82 | Motion to Alter/Amend Judgment | 1688-1693 |
| RE 83 | Motion for New Trial | 1695-1699 |
| RE 93 | Opinion and Order on Post-trial Motions | 1825-1835 |
| RE 96 | Notice of Appeal | 1841 |
| RE 100 | Transcript, Vol. 1 | 1852-2102 |
| RE 101 | Transcript, Vol. 2 | 2103-2226 |